No. 22-16110

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

AARON GREENSPAN,

*Plaintiff-Appellant,*

v.

OMAR QAZI,
SMICK ENTERPRISES, INC.,
ELON MUSK,
TESLA, INC.,

*Defendant-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
Civil Case No. 3:20-cv-03426-JD
Hon. James Donato

---

**APPELLANT'S MOTION FOR JUDICIAL NOTICE OF
CERTAIN DOCUMENTS**

---

Aaron Greenspan, *pro se*
956 Carolina Street
San Francisco, CA  94107-3337
+1 415 670 9350
aaron.greenspan@plainsite.org

## I.      Introduction

Defendants Elon Musk and Tesla, Inc. continue to be sued for violations of securities law.  Despite hiring some of the most expensive attorneys money can buy, they continue to be found by federal judges to have acted with scienter in violation of securities law, and continue to be credibly accused of violating securities law by former employees with access to internal documents.

## II.      Argument

### A. Materials To Be Noticed

Pursuant to Federal Rule of Evidence 201, this Court may take judicial notice of judicial rulings from other circuits and their component districts, as well as news articles.

First, Plaintiff requests judicial notice of the recent ruling of District Judge Andrew L. Carter, Jr. of the Southern District of New York in *Oklahoma Firefighters Pension and Retirement System v. Musk*, attached hereto as Exhibit A.

Second, Plaintiff requests judicial notice of the United States Securities and Exchange Commission's October 5, 2023 Application for Order Compelling Compliance with Administrative Subpoena, filed in the Northern District of California as Case No. 3:23-mc-80253-LB, attached hereto as Exhibit B.

Third, Plaintiff requests judicial notice of the facts contained in the October 12, 2023 CNBC article entitled "Tesla whistleblowers filed a complaint to the SEC

in 2021, but the agency never interviewed them.  Here's what the complaint said"

by Lora Kolodny, attached hereto as Exhibit C.

These documents did not exist previous to their respective dates of creation

and therefore could not be referenced in the underlying litigation or the briefs in

this appeal.

### B. Relevance

These materials are relevant to this appeal insofar as they demonstrate the

persistent bad faith of, and violations of securities law by, Defendants Musk and

Tesla, Inc.  Defendant Musk has leveraged his countless securities law violations,

literally and figuratively, to become one of the wealthiest and most influential

people on Earth.

### III.  Conclusion

For these reasons, the Court should grant Plaintiff's motion.

Dated: October 12, 2023

                                    Respectfully submitted,


                                    Aaron Greenspan
                                    956 Carolina Street
                                    San Francisco, CA  94107
                                    Telephone: +1 415 670 9350
                                    Fax: + 1 415 373 3959
                                    E-Mail: aaron.greenspan@plainsite.org

**<u>EXHIBIT A</u>**

*Oklahoma Firefighters Pension and Retirement System v. Musk*
Opinion and Order Dated September 29, 2023

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#: _____
DATE FILED: 9/29/23

| |
|---|
| **OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM,** <br><br>             **Plaintiff,** <br><br>       **-against-** <br><br> **MUSK,** <br><br>           **Defendants.** |

**22-cv-03026 (ALC)**

<u>**OPINION AND ORDER**</u>

**ANDREW L. CARTER, JR., United States District Judge:**

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System ("Lead Plaintiff" or "Plaintiff") brings this federal securities class action against Defendants Elon R. Musk ("Musk") and the Elon Musk Revocable Trust dated July 22, 2003 (the "Trust" and together, "Defendants"). The Complaint alleges that Defendants committed securities fraud in violation of Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder ("Count I"), Section 20A of the Exchange Act ("Count II"), and Section 20(a) of the Exchange Act ("Count III"). Lead Plaintiff brings this class action on behalf of a putative class of investors who sold the securities of Twitter[1] while Defendant Musk concealed his material ownership stake in Twitter, Inc. ("Twitter" or the "Company") between March 25, 2022 and April 4, 2022, inclusive (the "Class Period").

Currently pending before the Court is Defendants' motion to dismiss Plaintiff's Complaint pursuant to Federal Rules of Civil Procedure ("FRCP") 9(b) and 12(b)(6) and the Private Securities

---

[1] Although the Company is now known as "X," the Court will only refer to "Twitter" in accordance with the Complaint and the parties' briefing.

Litigation Reform Act of 1995 ("PSLRA"). For the following reasons, Defendants' Motion is **DENIED in part and GRANTED in part.**

## BACKGROUND

### I.     Procedural Background

Marc Bain Rasella first brought a securities action against Defendant Musk on April 12, 2022. ECF No. 1. On June 13, 2022, Oklahoma Firefighters Pension and Retirement System and Amalgamated Bank filed motions seeking appointment as Lead Plaintiff. ECF Nos 6, 8. Several other individuals also filed motions seeking appointment as lead plaintiff and appointment of lead counsel. On July 11, 2022, the Court referred these motions to Magistrate Judge Gabriel W. Gorenstein for decision. ECF No. 22. On September 2, 2022, Judge Gorenstein issued an Opinion and Order appointing Oklahoma Firefighters Pension and Retirement System as Lead Plaintiff and approving their selection of lead counsel. ECF No. 23.

Lead Plaintiff filed its Complaint on November 21, 2022. Compl., ECF No. 33.[2] On December 16, 2022, Defendants filed a pre-motion conference request for leave to move to dismiss Plaintiff's Complaint. ECF No. 36. The Court granted Defendants leave to file a motion to dismiss and set a briefing schedule. ECF No. 38. Defendants filed the instant motion to dismiss the Complaint on January 30, 2023, ECF No. 40, and the accompanying memorandum of law ("Mot."), ECF No. 41. On March 31, 2023, Plaintiff filed its opposition ("Opp."). ECF No. 42. Plaintiff also filed a declaration in support of its opposition. *See* Decl. of Katherine M. Sinderson ("Sinderson Decl."), ECF No. 43. On May 3, 2023, Defendant filed its reply memorandum of law ("Reply"). ECF No. 46. Lead Plaintiff filed a letter alerting the Court to supplemental authority on August 3, 2023. ECF No. 48.  The motion is deemed fully briefed.

---

[2] Lead Plaintiff originally filed its Amended Complaint on November 17, 2022, but, due to a clerical error, was directed to refile. The Court will refer only to the refiled Complaint at ECF No. 33.

II.     **Factual Background**

The Court accepts as true for purposes of this motion the well-pled allegations of the Complaint as supplemented by the documents incorporated by reference.

**A.  The Relevant Parties**

Lead Plaintiff Oklahoma Firefighters Pension and Retirement System is a public pension fund that provides retirement allowances and other benefits to firefighters in Oklahoma. Compl. ¶ 22. Currently, Lead Plaintiff manages over $3.8 billion in assets on behalf of nearly 26,000 participants. *Id*. Lead Plaintiff sold 14,367 shares of Twitter stock on the New York Stock Exchange ("NYSE") during the Class Period and alleges that it suffered damages as a result of the Defendants' violations of the federal securities laws. *Id*. ¶¶ 22, 71.

Defendant Musk is the owner of Twitter following a $44 billion takeover transaction that closed on October 27, 2022. *Id*. ¶ 23. After acquiring Twitter, Musk dubbed himself the Company's "Chief Twit," ousted Twitter's top executives, and terminated approximately half of Twitter's workforce. *Id*. Musk is also the CEO of Tesla, Inc. ("Tesla"), a public automotive and clean energy company that had a market capitalization of over $685 billion as of October 2022. *Id*. Musk is also the CEO and founder of several other technology companies, including Space-X and The Boring Company. *Id*. Plaintiff alleges that Musk has an estimated net worth of approximately $194 billion as of the date of the filing of this Complaint. *Id*. ¶ 24. Musk's biggest asset is his 155 million shares of Tesla stock, which accounts for a majority of his wealth. *Id*.

Defendant Musk's trust, the "Elon Musk Revocable Trust dated July 22, 2003" (the Trust") is also a named defendant. *Id*. ¶ 25. The Trust is a revocable trust of which Musk is the sole trustee. *Id*. According to Defendant Musk's Schedule 13D filed on April 5, 2022, the Twitter common

stock beneficially owned by Musk is "held by the Elon Musk Revocable Trust dated July 22, 2003." *Id*.

### B. Relevant Non-Parties

Twitter is a global social media company whose stock traded on the NYSE during the Class Period. *Id*. ¶ 26.  Twitter users interact with each other by publishing "tweets," of up to 280 characters, which can be liked, commented on, or reposted by other users. *Id*. Twitter users also can "follow" each other to view and interact with each other's tweets more readily. *Id*.  Since its origin in 2006, Twitter has become one of the biggest and most influential names in social media. *Id*.

### C. The Alleged Scheme

Plaintiff alleges that during the Class Period (March 25 to April 4, 2022, inclusive), Defendant Musk deliberately concealed his acquisition of more than 5% of Twitter stock by failing to file disclosures required by the SEC. Opp. at 1; Compl. ¶¶ 1,7–8. In furtherance of his scheme, Musk also hid and misrepresented his intent to change or influence the control of Twitter (referred to as "activist intent" by Plaintiff, Opp. at 1), and Plaintiff alleges that Musk's misconduct deprived investors who sold Twitter securities during the Class Period of material information regarding the true value of their securities. *Id*.

Plaintiff alleges that, unknown to investors, Defendant Musk first began acquiring Twitter stock on January 31, 2022. Compl. ¶ 62. On that date, Musk purchased over 600,000 shares of Twitter stock for $22.8 million. *Id*. Afterwards, Musk continued to silently purchase hundreds of thousands of shares of Twitter stock—and, in many instances, millions of shares—on a near daily basis in the weeks before the Class Period. *Id*. Musk would go from owning zero shares of Twitter stock as of January 28, 2022, to spending over $2 billion of his personal capital to acquire nearly

60 million shares of the Company by March 24, 2022. *Id*. Musk would ultimately purchase over $2.6 billion of Twitter shares from January 2022 through the end of the Class Period on April 4, 2022. *Id*. Plaintiff includes a table of Defendant Musk's Pre-Class Period purchases of Twitter stock, which the Court recreates below.

**TABLE 1: Musk's Pre-Class Period Purchases of Twitter Stock**
**(January 31, 2022—March 24, 2022)**

| Date | Shares Bought | Price | Cost to Defendant Musk |
|------|---------------|-------|------------------------|
| 1/31/2022 | 620,083 | $36.828 | $22,836,416.72 |
| 2/1/2022 | 542,496 | $37.549 | $20,370,182.30 |
| 2/2/2022 | 850,373 | $36.748 | $31,249,507.00 |
| 2/3/2022 | 3,649,957 | $34.391 | $125,525,671.19 |
| 2/4/2022 | 1,070,429 | $36.184 | $38,732,402.94 |
| 2/7/2022 | 4,839,507 | $36.515 | $176,714,598.11 |
| 2/8/2022 | 730,000 | $35.733 | $26,085,090.00 |
| 2/9/2022 | 638,283 | $36.886 | $23,543,706.74 |
| 2/10/2022 | 2,604,907 | $36.642 | $95,449,002.29 |
| 2/11/2022 | 1,291,432 | $36.523 | $47,166,970.94 |
| 2/14/2022 | 958,849 | $35.920 | $34,441,856.08 |
| 2/15/2022 | 371,075 | $36.511 | $13,548,319.33 |
| 2/16/2022 | 655,000 | $35.814 | $23,458,170.00 |
| 2/17/2022 | 731,581 | $35.891 | $26,257,173.67 |
| 2/18/2022 | 1,331,040 | $34.506 | $45,928,866.24 |
| 2/22/2022 | 1,256,751 | $33.231 | $41,763,092.48 |
| 2/23/2022 | 1,063,170 | $32.806 | $34,878,355.02 |
| 2/24/2022 | 838,793 | $33.765 | $28,321,845.65 |
| 2/25/2022 | 695,849 | $34.784 | $24,204,411.62 |
| 2/28/2022 | 1,025,518 | $35.320 | $36,221,295.76 |
| 3/1/2022 | 897,656 | $35.326 | $31,710,595.86 |
| 3/2/2022 | 992,785 | $34.575 | $34,325,541.38 |
| 3/3/2022 | 1,211,426 | $33.971 | $41,153,352.65 |
| 3/4/2022 | 1,016,259 | $33.376 | $33,918,660.38 |
| 3/7/2022 | 1,779,530 | $33.067 | $58,843,718.51 |
| 3/8/2022 | 2,228,858 | $33.769 | $75,266,305.80 |
| 3/9/2022 | 1,005,125 | $34.154 | $34,329,039.25 |
| 3/10/2022 | 1,228,833 | $33.932 | $41,696,761.36 |
| 3/11/2022 | 2,927,000 | $33.238 | $97,287,626.00 |
| 3/14/2022 | 2,770,284 | $33.082 | $91,646,535.29 |
| **Musk Reaches 5% Ownership:** | | | |
| 41,822,849 shares at a cost of $1,365,228,535.27 | | | |
| 3/15/2022 | 1,966,000 | $33.791 | $66,433,106.00 |

| 3/16/2022 | 2,978,376 | $34.992 | $104,219,332.99 |
| 3/17/2022 | 1,500,000 | $37.089 | $55,633,500.00 |
| 3/18/2022 | 2,858,340 | $38.252 | $109,337,221.68 |
| 3/21/2022 | 1,942,482 | $37.280 | $72,415,728.96 |
| 3/22/2022 | 2,476,000 | $38.542 | $95,429,992.00 |
| 3/23/2022 | 2,502,140 | $38.149 | $95,454,138.86 |
| 3/24/2022 | 1,926,764 | $38.675 | $74,517,597.70 |
| **Total Shares Purchased:** | **59,972,951** | | |
| **Total Cost:** | **$2,130,315,688.73** | | |

*See* Tbl. 1 of Compl.  On March 14, 2022, Musk's acquisitions of Twitter stock crossed the 5% ownership threshold. *Id*. ¶ 64. By this day, Musk had purchased 41,822,849 shares of Twitter stock. *Id*. This represented over 5.2% of Twitter's 800,641,166 shares of common stock outstanding as of February 10, 2022, as reported in Twitter's Annual Report on Form 10-K for the year ended December 31, 2022. *Id*. By crossing the 5% threshold, Musk triggered the start of the 10-day window to satisfy his Rule 13 disclosure obligations. *Id*. ¶ 65.

SEC Rule 13d-1, promulgated under Section 13(d) of the Exchange Act, requires that investors who obtain 5% beneficial ownership or more of a company's stock file a Schedule 13 form with the SEC within 10 calendar days of passing the 5% threshold. *Id*. ¶¶ 40, 52; 17 C.F.R. § 240.13d-1(1). According to Plaintiff, Schedule 13 filings are carefully tracked by investors, including because they signal that a company is "in play" for a potential takeover, which in turn will likely result in a stock price increase for the target company. *Id*. ¶ 47. Plaintiff alleges that for any investor, the filing of a Schedule 13D would represent a red flag that the Company is the target of a potential takeover and that the stock price will likely go up. *Id*. ¶ 49. Accordingly, the investor would invariably halt any plans for continued selling once a Schedule 13D was filed. *Id*. Given the importance of Schedule 13 filings to investors, broker-dealers will customarily inform their clients as their purchases approach the 5% threshold necessary for disclosure under Rule 13. *Id*. ¶ 50.

These notifications are provided as a matter of course and are particularly common amongst large-scale broker-dealers with shareholder reporting programs. *Id.*

On March 24, 2022, the last day of the 10-day window, Musk did not file the requisite Schedule 13D. *Id.* ¶ 66. Instead, Musk violated Rule 13, omitted his reporting obligations, and continued to secretly amass an ever-increasing ownership stake in Twitter. *Id.* That same day, according to texts subsequently made public through *Twitter, Inc. v. Musk*, C.A. No. 2022-0613-KSJM (Del. Ch.) (the "*Twitter* Action"), Musk texted with "TJ" (which news reports subsequently revealed to be Musk's ex-wife) that Musk would "Maybe buy [Twitter] and change it to properly support free speech." *Id.* ¶ 67.

Plaintiff's Class Period begins on March 25, 2022—the first day after Musk allegedly violated his obligation to file a Schedule 13D. *Id.* ¶ 68. Plaintiff alleges that on that day, over 20.7 million Twitter shares changed hands on the NYSE as Twitter investors sold or traded their Company securities without knowing about Musk's significant ownership interest or that "Twitter was in play for a potential takeover by Musk." *Id.* ¶ 68. Over the next 10 days, Musk amassed over 13 million additional Twitter shares at a cost of half a billion dollars. *Id.* ¶ 82-83. Again, Plaintiff included a table of Musk's acquisitions of Twitter stock and "other key events" during the Class Period, which the Court recreates below.

**TABLE 2: Key Events During the Class Period[3]**

| Date(s) | Key Events |
|---|---|
| Thursday, March 24, 2022 | • Ten-day deadline for compliance with Rule 13 expires.<br>• Musk files nothing and fails to satisfy his reporting requirements under Rule 13. |
| Friday, March 25, 2022 | • **Beginning of Class Period.**<br>• Musk purchased 3,491,274 shares of Twitter stock for $133,373,649.35. |

---

[3] All italicized and bolded text are as filed in the Complaint.

| Saturday, March 26, 2022 | • Musk and Jack Dorsey (founder and then-director of Twitter) privately "discuss[ed] the future direction of social media, including the benefits of open social protocols." <br> • Dorsey privately texted Musk that "Twitter started as a protocol. It should have never been a company. That was the original sin." Musk responded, "***I'd like to help if I am able to***… I think it's worth both trying to move Twitter in a better direction and doing something new that's decentralized." |
|---|---|
| Saturday, March 26, 2022 <br> Sunday, March 27, 2022 | • Musk spoke with Egon Durban (Twitter director) about "the potential of Mr. Musk joining the Twitter Board, ***as well as the fact that Mr. Musk had purchased a significant stake of more than five percent of [Twitter's] common stock."*** |
| Sunday, March 27, 2022 | • Musk spoke with Bret Taylor (then-Chair of Twitter's Board) and Parag Agrawal (Twitter's then-CEO) about "Mr. Musk['s] interest in Twitter and potentially joining the Twitter Board." During this discussion, "Mr. Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private." <br> • Egon Durban texted Musk as well as Agrawal, Taylor, and Martha Lane-Fox, Head of Nominating and Governance Committee, and stated: "Hi everyone. Parag (Ceo), Bret (Chairman) and Martha (head of gov) – You are connected with Elon. He is briefed on my conversations w you. Elon – everyone excited about prospect of you being involved and on [the] board." |
| Monday, March 28, 2022 | • Musk purchased 2,603,779 shares of Twitter stock for $100,953,719.39. |
| Tuesday, March 29, 2022 | • Musk purchased 2,875,934 shares of Twitter stock for $115,903,016.13. |
| Thursday, March 31, 2022 | • Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter['s] business as a director of Twitter." <br> • According to a nonpublic document cited in the Complaint in the *Twitter* Action, Musk internally determined that he wanted to ***buy*** Twitter to rid it of "crypto spam," which he viewed as a "major blight on the user experience." <br> • Musk purchased 2,000,000 shares of Twitter stock for $77,636,000.00. |
| Friday, April 1, 2022 | • Musk purchased 2,171,100 shares of Twitter stock for $85,413,245.10. |
| Sunday, April 3, 2022. | • Twitter formally invited Musk to join its Board of Directors. <br> • Musk sent a text message to Jared Birchall, Musk's wealth manager, stating "Jared, there is important paperwork to be done to ***allow for me to hopefully join the Twitter Board***." |
| Monday, April 4, 2022 | • Before the market opened, Musk partially disclosed his interest in Twitter and falsely filed a Schedule 13G with the SEC. The Schedule 13G revealed Musk's 9.2% ownership in Twitter. |

| | • The SEC privately probes Musk about inconsistences in his Schedule 13G.<br>• **End of Class Period.** |
|---|---|
| Tuesday, April 5, 2022 | • Before market open, Twitter filed a Form 8-K that announced the Company would appoint Musk to its Board of Directors<br>• Before market open, Musk and Agrawal announced Musk's appointment to Twitter's Board on Twitter.<br>• After market close, Musk belatedly filed a Schedule 13D disclosing his 9.1% ownership of Twitter and activist intentions. |
| Sources: Unsealed text messages in the Twitter Action; Proxy at 42; Musk's April 5, 2022 Schedule 13D. | |

*See* Tbl. 2 of Compl.  Defendant Musk purchased 2,000,000 to nearly 3,500,000 shares of Twitter stock on a near-daily basis, marking the highest overall volume of Twitter shares Musk purchased since his buying spree started on January 31, 2022. *Id*.  ¶ 82. All told, Musk purchased approximately 13,000,000 shares of Twitter stock during the Class Period, representing almost 20% of his total holdings. *Id*.

Plaintiff alleges that Musk's refusal to comply with his legal disclosure obligations allowed him to continue to acquire Twitter shares at artificially low prices and to continue his takeover campaign free of public scrutiny for the time being. *Id*. ¶ 69. Because the public was unaware that Defendant Musk was buying up Twitter stock, the stock price was artificially depressed by Musk's alleged deception. *Id*. Plaintiff also alleges that Musk knew he was saving a considerable amount of money by omitting disclosure of his Twitter interest, but at the time he did not know exactly how much he was saving. *Id*. Musk also knew that these savings would end as soon as he disclosed his growing stake in Twitter to the public—as investors would know that the Company was in play for a takeover, would stop selling their shares at artificially low prices, and many investors would start buying—thereby driving up Twitter's stock price. *Id*. Plaintiff alleges in the Complaint that Musk's failure to comply with his disclosure obligations ultimately saved him over $200 million on his acquisitions of Twitter shares during the Class Period. *Id*.

Investors who sold Twitter securities during the Class Period, on the other hand, were allegedly "cheated out" of the true value of the securities that they traded. *Id.* ¶ 71. As alleged by Plaintiff, the filing of a Schedule 13D predictably drives up the price of a company's stock and therefore Musk's "willful nondisclosure" of his Twitter interests and failure to comply with Rule 13 meant that the millions of shares sold during the Class Period occurred at artificially depressed prices. *Id.*

The Complaint alleges that instead of disclosing his growing stake in Twitter, Musk decided to "issue messages about Twitter and even sought to distract attention away from his interest in the Company." *Id.* ¶ 72. At the same time, Musk privately continued to amass more Twitter stock. *Id.* For example, on March 25, 2022, Musk posted a poll to Twitter, stating "Free Speech is essential to a functioning democracy. Do you believe that Twitter rigorously adheres to this principle?" *Id.* ¶ 73.  He later tweeted: "The consequences of this poll will be important. Please vote carefully." After more than 2,035,000 votes, over 70% of the participants said "No." *Id.* Plaintiff included a screenshot of the alleged tweet:



On March 26, 2022, Musk followed up on his poll by stating "Given that Twitter serves as the de facto public town square, failing to adhere to free speech principles fundamentally undermines democracy," and then asking, "Is a new platform needed?" *Id.* ¶ 74. Plaintiff included a screenshot of this tweet as well:



Later that same day, Musk replied to a twitter user that he is "giving serious thought" to building a new social media platform. *Id*. ¶ 75. All the while, Musk was still increasing his stake in Twitter. *Id*. ¶ 72.



In addition to this "public misdirection on Twitter", Musk held a series of private meetings with Parag Agrawal (Twitter's then-CEO) and other Company insiders like Jack Dorsey (Twitter's founder and then-director) and Bret Taylor (then-Chair of Twitter's Board) during the Class Period *Id*. ¶¶10, 76-83, 120.

On March 26, 2022, the second day of the Class Period and the same day Musk tweeted that he was "giving serious thought" to creating a rival platform to Twitter, Musk contacted Dorsey. *Id*. ¶ 77 (citing Form PREMA14A filed with the SEC on May 17, 2022 (the "Proxy")). Musk and Dorsey privately "discuss[ed] the future direction of social media, including the benefits of open social protocols." *Id*. In one specific exchange unknown to investors, and unsealed in the *Twitter* Action, Dorsey privately texted Musk that "Twitter started as a protocol. It should have never been a company. That was the original sin." *Id*. Musk responded, "I'd like to help if I am able to … I think it's worth both trying to move Twitter in a better direction and doing something new that's decentralized." *Id*. According to Plaintiff, Musk's response confirmed that his intention was to change or influence the control of the Company. *Id*. On both March 26 and 27, 2022, Musk spoke with Egon Durban (Twitter director) about "the potential of Mr. Musk joining the Twitter Board, as well as the fact that Mr. Musk had purchased a significant stake of more than five percent of [Twitter's] common stock." *Id*. ¶ 78 (quoting Proxy at 42).

Also on March 27, 2022, Musk spoke with Bret Taylor and Agrawal about "Mr. Musk's interest in Twitter and potentially joining the Twitter Board." *Id*. ¶ 79 (quoting Proxy at 42). During this discussion, "Mr. Musk stated that he was considering various options with respect to his ownership, including potentially joining the Twitter Board" or "seeking to take Twitter private." *Id*. That same day, in an exchange unsealed in the *Twitter* Action, Egon Durban texted Musk as well as Agrawal, Taylor, and Martha Lane-Fox, former Head of Twitter's Nominating and Governance Committee, and stated: "Hi everyone. Parag (Ceo), Bret (Chairman) and Martha (head of gov) – You are connected with Elon. He is briefed on my conversations w you. Elon – everyone excited about prospect of you being involved and on [the] board." *Id*.

On March 31, 2022, Musk again privately spoke with Agrawal and Taylor, "reiterat[ing] his interest in potentially joining the Twitter Board to help improve Twitter's business as a director of Twitter." *Id.* ¶ 80 (quoting Proxy at 42). Plaintiff also alleges that on March 31, 2022, according to a nonpublic document cited in the Complaint filed by Twitter in the *Twitter* Action, Musk internally determined that he wanted to buy Twitter to rid it of "crypto spam," which he viewed as a "major blight on the user experience." *Id.* ¶ 81.

On April 3, 2022, unknown to investors, Twitter formally invited Musk to join its Board of Directors. *Id.* ¶ 84. That same day, as revealed in a text message unsealed in the *Twitter* Action, Musk sent a text message to Jared Birchall, Musk's wealth manager, stating "there is important paperwork to be done to allow for me to hopefully join the Twitter Board." *Id.* On April 4, 2022, Musk and Twitter entered into a letter agreement providing, *inter alia*, that Musk would be appointed to Twitter's Board. *Id.* Plaintiff alleges that knowing Twitter would disclose that he was joining its Board—which would likely lead to the disclosure of his ownership in the Company—Musk understood that his secret buying scheme had to come to an end. *Id.* ¶ 85.

On April 4, 2022, Musk belatedly provided investors with a partial disclosure of his interest in Twitter when he filed a Schedule 13G with the SEC. *Id.*; Ex. A to Sinderson Decl., ECF No. 43-1. This Schedule 13G reported that Musk owned 9.2% of Twitter's common stock. *Id.* In this filing, Musk noted that the "Date of Event" that required the submission of the filing was March 14, 2022. *Id.* Plaintiff contends that this confirms "beyond question that it was 11 days late, and 21 days after his Twitter interest had crossed the 5% threshold." *Id.*

This is when the public first learned that Musk was Twitter's largest shareholder. *Id.* ¶ 86. The Wall Street Journal reported on May 11, 2022 that the "lag" allowed Musk "to buy more stock without alerting other shareholders to his ownership." *Id.*

The Complaint alleges, however, that Musk's Schedule 13G filing only partially revealed the truth. *Id*. ¶ 87. Schedule 13 forms reveal the name, ownership stake, and the stated intentions of the filer. *Id*. ¶ 51. The specific type of Schedule 13 that must be filed—Schedule 13D or Schedule 13G—largely depends on the investor's intentions for the target company. *Id*. The default presumption for investors that hit the 5% beneficial ownership threshold is that they are "active investors" and must file a Schedule 13D that discloses the purpose of their acquisition. *Id*. ¶ 52; *see also* Rule 13d-1(a), 17 C.F.R. § 240.13d-1. However, if certain exceptions apply, an investor may disclose an over-5% interest in a company via a Schedule 13G, which is a "short-form" filing with fewer requirements. *Id*. ¶ 53. An investor may file a Schedule 13G if they acquired the securities without a purpose or effect "of changing or influencing the control of the issuer." *Id*. (quoting 17 C.F.R. § 240.13d-1(c)(1)). As such, a Schedule 13G filing signals to the market that the investor is taking a passive interest in the target company. Compl. ¶ 53. Indeed, when filing a Schedule 13G form pursuant to this exception, an investor must expressly certify that they have "not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer, or in connection with or as a participant in any transaction having that purpose or effect." *Id*. (quoting 17 C.F.R. § 240.13d-1(c)(1)). In fact, in Question and Answer 103.04 of the SEC's Questions and Answers of General Applicability for Section 13(d), the SEC explained that reaching the 5% threshold while becoming a member of a target company's board presumptively qualifies as acquiring securities "with the effect of, changing or influencing the control of the issuer," and thus "eliminate[s] … eligibility to file on Schedule 13G pursuant to Rule 13d-1(c)." *Id*.

The Complaint alleges that in order to delay the full disclosure of his activist intentions, Musk affirmatively deceived investors through his filing of the Schedule 13G. *Id*. ¶ 87. First, Musk, who

Plaintiff alleges is not a passive investor, chose the Schedule 13G form, which is reserved for passive investors. *Id*. Second, Musk's Schedule 13G omitted any mention of Musk joining Twitter's Board. *Id*. Third, the Complaint alleges that Musk deliberately manipulated the Schedule 13G form to omit a required certification and that this deliberate act underscores that Musk knew, or at minimum was reckless as to, the misleading nature of his Schedule 13G filing. *Id*.

In his Schedule 13G form, Musk claimed he was filing a Schedule 13G pursuant to the exemption in 17 C.F.R. § 240.13d-1(c), which requires the filer to swear to the following certification as a condition of filing:

> Item 10. Certifications
>
> By signing below I certify that, to the best of my knowledge and belief, the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer of the securities and were not acquired and are not held in connection with or as a participant in any transaction having that purpose or effect, other than activities solely in connection with a nomination under § 240.14a-11.

*Id*. ¶ 89.[4] However, Musk intentionally removed this language in the Schedule 13G that he personally signed and filed on April 4, 2022. Musk replaced the certification language with the words "Not Applicable." *Id*. Later that same day, unknown to investors at the time, the SEC's Office of Mergers and Acquisitions sent Musk a letter inquiring about improprieties in his Schedule 13G. *Id*. ¶ 90; *see also* Exhibit C to Sinderson Decl., ECF No. 43-3. This letter was publicly filed on April 6, 2022. *Id*. Specifically, the SEC's questions included the following:

> (a) "Please advise us why the Schedule 13G does not appear to have been made within the required 10 days from the date of acquisition as required by Rule 13d-1(c), the rule upon which you represented that you relied to make the submission."
>
> (b) "Given that a beneficial owner relying upon Rule 13d-1(c) to make a filing on Schedule 13G in lieu of Schedule 13D must provide a response to Item 10(c) of the form, please advise us why the response provided in Item 10 of this Schedule 13G,

---

[4] The SEC publishes a standard form that has this certification language included by default (available here: https://www.ecfr.gov/current/title-17/chapter-II/part-240/section-240.13d-102). Compl. ¶ 89.

titled 'Certifications,' indicates that you determined the line item was '[n]ot [a]pplicable.'"

(c) "Please provide us with a brief analysis of the bases upon which you determined that you were eligible to rely upon Rule 13d-1(c) to make the filing on Schedule 13G. Your response should address, among other things, your recent public statements on the Twitter platform regarding Twitter (the issuer), including statements questioning whether Twitter (the issuer) 'rigorously adheres to' 'free speech principles.'"

*Id*. The Complaint alleges that although investors did not know the full truth regarding Musk's plans for Twitter, investors reacted strongly to the revelation of Musk's ownership interest in Twitter. *Id*. ¶ 91. In response, Twitter's stock price increased precipitously, soaring approximately 27% on unusually high trading volume—an increase of $10.66 per share—to close at $49.97 on April 4, 2022 (from the prior close of $39.31 on Friday, April 1, 2022). *Id*.

According to the Complaint, analysts noted Musk's substantial stake in Twitter but believed that it was passive given the Schedule 13G filing. *Id*. ¶ 92. For example, Bank of America analysts stated that they "expect[ed] the news to drive significant retail investor interest in, and activity for, the stock" and "highlight platform value to potential acquirers"—but explained that "[t]he type of form used (13G) often indicates the investor isn't seeking to acquire control, or to influence who controls it." *Id*.

Before the markets opened for trading on April 5, 2022, Twitter filed a Form 8-K press release announcing that Twitter would appoint Musk to its Board of Directors. *Id*. ¶ 93. Shortly after filing the Form 8-K, Agrawal and Musk announced Musk's appointment to the Board on Twitter. *Id*. Agrawal disclosed that "[t]hrough conversations with Elon in recent weeks, it became clear to us that he would bring great value to our Board." *Id*. Musk responded that he was "[l]ooking forward to working with Parag & Twitter board to make significant improvements to Twitter in coming months!" *Id*. Plaintiff included a screenshot of the tweet:

16



The Complaint alleges that later that day, Defendant Musk's lawyers amended his Schedule 13G and filed a Schedule 13D form that disclosed both Musk's ownership stake in Twitter and the fact that he was joining the Board. *Id.* ¶ 95.[5] Twitter's stock price closed at $50.98 per share on April 5, 2022, an unusually high trading volume, up from $49.97 on April 4, 2022—a total increase of nearly 30% since Musk first publicly disclosed his ownership stake in Twitter on April 4, 2022. *Id.* ¶ 94.  Twitter's stock continued to react positively to this news on April 6, 2022, after accounting for market-wide stock price movements. *Id.*

**D.  Alleged Materially False and Misleading Statements and Omissions**

Plaintiff alleges that on each day of the Class Period (March 25, 2022 to April 4, 2022), Musk willfully disregarded his statutory obligation to file a Schedule 13 form and that he knowingly omitted the material fact of his steadily increasing ownership in Twitter, as required under Rule 13. *Id.* ¶ 127. The Complaint alleges that Musk also omitted disclosure of his plans to potentially takeover Twitter and that his silence was a materially misleading omission each day of the Class

---

[5] The Schedule 13D revealed that all Twitter shares beneficially owned by Musk are held by the Trust and further admitted that "Musk is the sole Trustee" of the Musk Trust. Compl. ¶ 95; *see also* Exhibit B. to Sinderson Decl., ECF No. 43-2.

Period because Musk knew he owned an interest greater than 5% in Twitter and intended to, or did, change or influence the control of Twitter. *Id.*

Additionally, the Complaint alleges that as to the Schedule 13G originally filed on April 4, 2022, Defendant Musk falsely and misleadingly omitted the required certification under Item 10 of the Schedule 13G that the investor "[h]as not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer," and instead affirmatively stated that this certification was "Not Applicable." *Id.* ¶ 128. Musk also "certif[ied] that the information set forth in" the Schedule 13G was "true, complete and correct." *Id.* Plaintiff alleges that the statements in Musk's April 4, 2022 Schedule 13G were materially false and misleading and omitted material facts because, before filing the Schedule 13G, Musk engaged in numerous discussions with Twitter leadership, including about joining Twitter's Board or taking Twitter private; Musk had agreed to join Twitter's Board on April 4, 2022 (the same day he filed the misleading Schedule 13G), and Musk soon carried out his plan to take over Twitter by making an offer to purchase the Company on April 14, 2022. *Id.* ¶ 129. Plaintiff contends that Musk was not a "passive" investor, and he was therefore subject to a statutory obligation to adequately disclose his activist intentions and ownership via a Schedule 13D filing. *Id.*

### E. Post-Class Period Events

On April 9, 2022, through a private conversation with Agrawal, Musk finally revealed his plan to buy the Company outright. *Id.* ¶ 102. On April 13, 2022, Musk delivered an official non-binding proposal to purchase Twitter to the Board for $54.20 per share. *Id.* On April 25, 2022, Twitter announced that it accepted Musk's proposal to acquire the company at $54.20 per share. *Id.* ¶ 103. A joint press release announcing the buyout included Musk's personal promise to "make Twitter better" by "defeating the spam bots." *Id.*

18

On July 8, 2022, Musk claimed that he was terminating the deal, and on July 12, 2022, Twitter filed a complaint in Delaware Court of Chancery alleging breach of Musk's contractual obligations under the merger agreement, seeking specific performance of Musk's obligations under the agreement. *Id*. ¶ 108. On October 4, 2022, Musk announced that he would abandon his "battle" with Twitter and pay shareholders the originally offered $54.20 per share. *Id*. ¶ 109. On October 28, 2022, Musk and Twitter closed the deal. *Id*. ¶ 110. After the deal closed, Musk  terminated roughly half of Twitter's workforce, including by ousting top executives like Twitter CEO Agrawal and the Company's Board of Directors, leaving Musk as the sole director of the Company. *Id*. ¶ 111.

## LEGAL STANDARD

### I.   Motions to Dismiss under Rule 12(b)(6)[6]

When deciding a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, the Court need not credit "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Claims should be dismissed when a plaintiff has not pleaded enough facts that "plausibly give rise to an entitlement for relief." *Id.* at 679. A claim is plausible "when the plaintiff pleads factual content that allows the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678

---

[6] Although the Court generally should not look outside of the pleadings to decide a motion to dismiss a complaint, the Court may consider "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit" of which a court may take judicial notice. *Sgalambo v. McKenzie*, 739 F.Supp.2d 453, 470 (S.D.N.Y. 2010) (quoting *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007)).

(citing *Twombly*, 550 U.S. at 556). While not akin to a "probability requirement," the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). Accordingly, where a plaintiff alleges facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557.The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985).

## II.     Motions to Dismiss under Fed. R. Civ. P. 9(b) and the PLSRA

When a plaintiff has alleged securities fraud claims, the complaint is subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA. Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud or mistake." To satisfy the particularity requirement, a complaint must "(1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co., LLC*, 783 F.3d 395, 403 (2d Cir. 2015).

The PSLRA holds private securities plaintiffs to an even more stringent pleading standard. Under the PSLRA, a plaintiff must "(1) specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading; and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321 (2007) (internal citation and quotation marks omitted) (quoting 15 U.S.C. § 78u-4(b)). To determine that an inference of scienter is strong, the court must decide whether "a reasonable person would deem the inference of scienter cogent

and at least as compelling as any opposing inference one could draw from the facts alleged."
*Tellabs*, 551 U.S. at 324.

These heightened pleading standards, when viewed together with the more general standards
applicable to Rule 12(b)(6) motions to dismiss under *Twombly* and *Iqbal,* make clear that
"plaintiffs must provide sufficient particularity in their allegations to support a plausible inference
that it is more likely than not that a securities law violation has been committed." *In re Lululemon
Sec. Litig.*, 14 F. Supp. 3d 553, 570 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

### III.     Section 10(b) and Rule 10b-5

To plead a claim under Section 10(b) and Rule 10b-5, a plaintiff must adequately allege: "(1) a
material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between
the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the
misrepresentation; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John
Fund, Inc.*, 573 U.S. 258, 267 (2014); *Waggoner v. Barclays PLC*, 875 F.3d 79, 93 n.23 (2d Cir.
2017).

### IV.     Section 20A

Insider trading claims under Section 20(A) are likewise subject to FRCP 9(b) and the PSLRA.
*See In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d 111, 175 (S.D.N.Y.
2021).  Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, provides:

> Any person who violates any provision of [the Exchange Act] or the rules or
> regulations thereunder by purchasing or selling a security while in possession of
> material, nonpublic information shall be liable ... to any person who,
> contemporaneously with the purchase or sale of securities that is the subject of such
> violation, has purchased ... securities of the same class.

15 U.S.C. § 78t-1(a). "In order to state a claim under Section [20(A)], plaintiffs must: (1) plead
a predicate insider trading violation of the Exchange Act and (2) allege sufficient facts showing

'that the defendant traded the security at issue contemporaneously with the plaintiff.'" *In re Shanda Games Ltd. Sec. Litig.*, No. 1:18-CV-2463-ALC, 2022 WL 992794, at *7 (S.D.N.Y. Mar. 31, 2022) (quoting *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 309 (S.D.N.Y. 2008)).

## DISCUSSION

Lead Plaintiff brings claims under Section 10(b) of the Exchange Act against Defendants Musk and the Trust. Lead Plaintiff also brings claims for insider trading against Defendants Musk and the Trust pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1. Finally, Plaintiff brings a claim under Section 20(a) of the Exchange Act against Defendant Musk.

Defendants put forth several arguments in the instant motion. First, Defendants argue that Plaintiff's first cause of action fails because Plaintiff cannot seek damages under Section 10(b) or Rule 10b-5 for a breach of Section 13(d). Second, Defendants argue that Plaintiff's allegations negate any potential inference of scienter. Third, Defendants contend that Plaintiff has failed to properly plead loss causation. Fourth, Defendants contend that Plaintiff failed to plead that Defendant Musk engaged in insider trading under Section 20A. The Court addresses each argument in turn.

### I. Section 10(b) and Rule 10b-5 Claim

### A. Section 13(d) of the Exchange Act

"Section 13(d) of the Securities Exchange Act requires 'certain disclosures to be filed on a Schedule 13D by a person that acquires an interest in more than 5% of certain classes of securities.'" *Puddu v. 6D Glob. Techs., Inc* ("*Puddu II*"), No. 15-CV-8061 (AJN), 2021 WL 1198566, at *6 (S.D.N.Y. Mar. 30, 2021) (quoting *Amida Capital Mgmt. II, LLC v. Cereberus Capital Mgmt., L.P.*, 669 F. Supp. 2d 430, 438 (S.D.N.Y. 2009)); *see also* 15 U.S.C. § 78m(d) and 17 C.F.R. § 240.13d–101). Rule 13d-1, promulgated under Section 13(d) of the Exchange Act,

provides that any person who becomes "directly or indirectly the beneficial owner of more than five percent of [a covered class of equity security] shall, within 10 days after the acquisition, file with the Commission, a statement containing the information required by Schedule 13D." *See* 17 C.F.R. § 240.13d-1(a). "Section 13(d)'s purpose is to alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing." *United States v. Bilzerian*, 926 F.2d 1285, 1297 (2d Cir. 1991) (citation and quotation marks omitted) (alteration in original); *accord GAF Corp. v. Milstein*, 453 F.2d 709, 717 (2d Cir. 1971) ("the purpose of section 13(d) is to alert the marketplace to large, rapid aggregation or accumulation of securities, regardless of technique employed, which might represent a potential shift in corporate control"). "Thus, an intentional failure to disclose beneficial ownership information when disclosure was expressly required signals falsely to investors that there is no such ownership to disclose." *Puddu II*, 2021 WL 1198566, at *6

### B. Section 10(b) and Rule 10b-5 Claims Predicated on Section 13(d) Violations

As a threshold matter, Defendants argue that Plaintiff's first cause of action fails because Plaintiff cannot seek damages under Section 10(b) or Rule 10b-5 for a breach of Section 13(d). Mot. at 7. Defendants argue that Section 18(a) of the Exchange Act provides the exclusive remedy for claims based on violations of Section 13(d) because there is no private damages remedy for issuers or shareholders under Section 13(d). *Id.* at 2, 7–8. Plaintiff, however, argues that "it is settled law that a failure to disclose the information required under Section 13(d) gives rise to liability under Section 10(b) for damages due to material omissions." Opp. at 8.

Defendants rely on the Second Circuit's 1989 decision in *Kamerman*, where the Second Circuit dismissed a claim brought under Section 13(d). 891 F.2d at 430. In *Kamerman*¸ the plaintiff asserted, *inter alia*, claims under both Section 10(b) and Section 13(d) of the Exchange Act. *See*

*id*. at 425. There, the plaintiff alleged that the defendants had filed several false and misleading Schedule 13D forms. *Id*. at 430. The Second Circuit dismissed the claim brought under Section 13(d), holding that "[o]ne complaining of a false or misleading statement in a Schedule 13D may seek damages only under Section 18(a) of the Act, 15 U.S.C. § 78r(a)." *Id*. at 430.[7]

In its dismissal of the 13(d) claim, the Second Circuit relied on a district court case, *Sanders v. Thrall Car Mfg. Co*., 582 F.Supp. 945, 960 (S.D.N.Y.1983), *aff'd*, 730 F.2d 910 (2d Cir.1984), which in turn cited a Supreme Court case from 1979—*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979). In *Reddington*, the Court noted that "[t]here is evidence to support the view that § 18(a) was intended to provide the exclusive remedy for misstatements contained in any reports filed with the" SEC. 442 U.S. at 573 (citing legislative history). But *Redington* expressly declined to decide that question. *See id*. at 574 ("[W]e need not decide whether Congress expressly intended § 18(a) to provide the exclusive remedy for misstatements contained in § 17(a) reports."). Relying on *Reddington*, the district court in *Sanders* held that it could not imply a private right of action for damages under Section 13(d). *Sanders*, 582 F. Supp. at 960–62. The district court reasoned that "Congress had expressly provided a damages remedy under §18(a) of the Act" and that, quoting the *Reddington* decision, "'there is evidence to support the view that §18(a) was intended to provide the exclusive remedy for misstatements in any reports filed with the [SEC].'" *Sanders*, 582 F. Supp. at 960 (quoting *Reddington*, 442 U.S. at 573–74). However, the court in *Sanders* did not decide—nor was it asked to decide—whether a Section 10(b) or Rule 10b-5 claim could provide a remedy for a false statement contained in a 13D disclosure.

---

[7] The court went on to affirm the dismissal of any claim under Section 18(a) because the plaintiff, who was suing derivatively on behalf of a company, could not establish that the company relied on the allegedly false Schedule 13D forms. *Kamerman*, 891 F.2d at 430. Reliance is a necessary element of Section 18(a) claims. *Id*.

In *Kamerman*, the plaintiff also alleged that the "false statements of purpose in [defendants'] Schedule 13D filings constituted violations of Rule 10b-5." *Id*. at 431. The Court then proceeded to evaluate the merits of the plaintiff's separate Section 10(b) claim that was predicated on a 13(d) violation, which it ultimately dismissed, finding that the plaintiff had not adequately alleged the element of reliance. *Id*. at 430–31. Defendants argue that the Second Circuit has made clear that a plaintiff cannot recover for a breach of Section 13(d) by seeking damages under Section 10(b) or Rule 10b-5 and that a plaintiff's claim for damages based on a failure to file a Schedule 13D form must be brought under 18(a) of the Exchange Act. Mot. at 2, 8–9.  In other words, Defendants argue that because Plaintiff can only seek damages for Musk's alleged failure to disclose his ownership stake in Twitter under 18(a), Plaintiff's Section 10(b) claim must be dismissed.  *Id.*

On the other hand, Plaintiff argues that the *Kamerman* decision supports the notion that a violation of Section 13(d) disclosure obligations may still be the basis of a Section 10(b) claim. Opp. at 10-11. Plaintiff relies on two recent cases: *Puddu I* and *Puddu II*.  In *Puddu v. 6D Glob. Techs., Inc* ("*Puddu I*"), the Second Circuit reversed the dismissal of a Section 10(b) claim premised on a failure to disclose a defendant's beneficial ownership of "more than 5%" of a company's securities. 742 Fed. App'x 553, 555-56 (2d Cir. 2018) (summary order). The Second Circuit noted that the securities laws "require[] [disclosure of] beneficial owners of more than 5% of [a company's] securities" and held that the complaint stated a valid Section 10(b) claim by plausibly alleging that defendants had "failed to disclose [a defendant's] beneficial ownership." *Id.* at 555-56. On remand, Judge Nathan held that "the allegation that [defendant] was obligated to file the Schedule 13D—and opted not to do so—is enough to adequately plead a material omission for purposes of Plaintiffs' 10(b) claim." *Puddu II*, No. 15-CV-8061 (AJN), 2021 WL 1198566, at

*6 (S.D.N.Y. Mar. 30, 2021). Thus, Plaintiff contends that in *Puddu I*, the Second Circuit endorsed the validity of Section 10(b) claims for damages arising from omissions in the face of Section 13 duties of disclosure. Opp. at 8.

Having reviewed both parties' arguments and the relevant caselaw, the Court agrees with Plaintiff's interpretation of the caselaw. To state a Rule 10b-5 claim for a misrepresentation, one must allege, *inter alia*, that a defendant made a materially false statement in connection with the purchase or sale of a security. *ATSI Commc'ns, Inc.*, 493 F.3d at 105. Here, Plaintiff has alleged material omissions and misstatements on a 13D form in violation of Section 13(d). The fact that some violations of Section 13(d) may also be actionable under Section 18(a) does not preclude a claim under Section 10(b). *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 383 (1983) ("While some conduct actionable under Section 11 may also be actionable under Section 10(b), it is hardly a novel proposition that the Securities Exchange Act and the Securities Act prohibit some of the same conduct.") (cleaned up).

Additionally, based on the Second Circuit's tacit endorsement of Section 10(b) claims premised on the violation of Section 13(d), Plaintiff's claim that Defendant Musk was obligated to file a Schedule 13D form after reaching an ownership stake in Twitter of over 5% and failed to do so, is a valid claim under Section 10(b). The Court finds that Defendant's reasoning stretches the holding of *Kamerman* too far. In *Kamerman*, the plaintiff had alleged a claim under Section 13(d), which the Second Circuit determined does not provide damages. Here, by contrast, Plaintiff has alleged a claim under *Section 10(b)*. In *Kamerman*, the Second Circuit did not explicitly hold that a Section 10(b) claim could not be predicated on a violation of 13(d)—it merely held that Section 13(d) itself does not contain a private right of actions for damages. Indeed, in *Kamerman*, the Second Circuit separately evaluated the merits of the Section 10(b) claim, which, as is the case

here, was based on a violation of Section 13(d)'s disclosure obligations.[8] 891 F.2d at 430–31. If

the Second Circuit could not provide a damages remedy under Section 10(b) for the alleged false

statement in the Section 13D form, there would have been no need for the court to evaluate the

10b-5 claim in the first place.[9]   Likewise, in *Puddu I,* the Second Circuit reversed the dismissal of

a Section 10(b) claim predicated on a violation of Section 13(d), indicating that such a claim is

cognizable in this Circuit.[10]

Defendants similarly point to *Takata v. Blockchain Inc.*, No. 18-CV-02293 (ZNQ)(TJB),

2022 WL 1058389 (D.N.J. Apr. 8., 2022), an opinion of a district court within the District of New

Jersey.   However, *Takata's* reasoning is not persuasive here.   In *Takata*, the court addressed the

question of whether "damages [are] available as a remedy when liability for Section 10(b) arises

from a Section 13(d) violation" *Id*. at *5. In its analysis, the court noted that "some courts have

found that a plaintiff may point to a violation of section 13(d) as the predicate for a 10b-5 claim."

---

[8] Defendants argue that notwithstanding the Second Circuit Circuit's separate evaluation of plaintiff's Section 10(b) claim, the plaintiff in *Kamerman* did not seek damages under her Section 10(b) claim and therefore *Kamerman* forecloses all Section 10(b) damages claim premised on a breach of Section 13(d) obligations. Reply at 2. However, in *Kamerman* the Second Circuit never discussed the relief sought by Plaintiff when it evaluated the Section 10(b) claim, nor did it expressly hold that damages could not be sought under Section 10(b). *See Kamerman*, 891 F.2d at 430-431. Therefore, this Court declines to infer that the Second Circuit foreclosed all Section 10(b) damages claims premised on Section 13(d) violations.

[9] Although the Second Circuit ultimately also dismissed that claim, it was because it found that the plaintiff had not properly alleged reliance, not because a Section 10(b) claim cannot be predicated on a misstatement or omission on a Schedule 13(D). *Kamerman*, 891 F.2d at 430–31.

[10] Defendants argue that *Puddu II* is inapplicable to the facts here because the court did not disturb *Kamerman*, nor did it explicitly address whether damages are available to a private plaintiff under Section 10(b) for a breach of Section 13(d). Reply at 2. While *Puddu II* did not directly address damages, this fact alone does not necessitate the conclusion that Section 10(b) damages claims based on Section 13(d) violations are wholly invalid. Additionally, it appears that the plaintiff in *Puddu II* explicitly sought damages under its Section 10(b) claim. *See* Second Amend. Compl, ECF No. 107, No. 15-cv-08061 (S.D.N.Y. April 4, 2016).

*Takata*, 2022 WL 1058389, at *5 (D.N.J. Apr. 8, 2022) (citing *Vladimir v. Bioenvision Inc.*, 606 F.Supp.2d 473, 490-491 (S.D.N.Y. 2009) *aff'd.*, *Thesling v. Bioenvision*, 374 Fed.App'x. 141 (2d Cir. 2010)). Although *Takata* acknowledged and reviewed *Kamerman*, *Puddu II*, and other Second Circuit caselaw, the court held that "Section 13(d) violation may not give rise to a private right of action for damages under Section 10(b)." *Id*. at *10. In discussing its holding, the court in *Takata* explained that "[a]lthough the Third Circuit has indicated that plaintiffs may bring an action for a Section 13(d) violation under both Section 10(b) and Section 18(a), the Court cannot find any support that the courts in the Third Circuit intended for such an action to be brought under only Section 10(b)" and that "[i]n fact, the Third Circuit has narrowed the instances where a duty to update a Schedule 13D may give rise to injunctive relief." *Id*. (internal citations omitted) (citing *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 277, 227 & 283–84 (3d Cir. 2006) and *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997)). The Court does not find *Takata*'s reasoning to be persuasive because it does not meaningfully engage with the *Kamerman* court's decision to evaluate a Section 10(b) claim based on alleged false statements in a Schedule 13D filings. *Takata*, 2022 WL 1058389, at *7. Additionally, the *Takata* Court appears to heavily rely on Third Circuit caselaw, which is not binding on this Court.

Moreover, other courts in this district have sustained claims brought pursuant to Section 10(b) for violation of an issuers disclosure obligations under Section 13(d). *See Puddu II*, 2021 WL 1198566, at *6 ("[T]he allegation that [defendant] was obligated to file the Schedule 13D—and opted not to do so—is enough to adequately plead a material omission for purposes of Plaintiffs' 10(b) claim."); *Gruber v. Gilbertson*, No. 16CV9727, 2018 WL 1418188, at *8 (S.D.N.Y. Mar. 20, 2018) ("The omission concerning [defendants'] ownership interest is actionable [under Rule 10-5(b)] because they had a duty to disclose it" pursuant to Section 13(d)

of the Securities Exchange Act.); *Vladimir v. Bioenvision Inc.*, 606 F. Supp. 2d 473, 490–91

(S.D.N.Y. 2009), *aff'd sub nom. Thesling v. Bioenvision, Inc.*, 374 F. App'x 141 (2d Cir. 2010)

(summary order) ("There is no private right of action under section 13(d) of the Exchange Act, but

a plaintiff can point to a violation of section 13(d) as the predicate for a 10b–5 claim."). Therefore,

contrary to Defendants' argument, and *Takata*, this Court cannot infer that the Second Circuit has

definitively foreclosed Section 10(b) claims based on a violation of a 13(d) obligation.

Plaintiff additionally points to a recent decision by the District Court of D.C. that is

consistent with this Court's holding today.  In *In re Bed Bath & Beyond Corp. Sec. Litig.*, the

complaint alleged a Section 10(b) claim based on the defendant's "materially misleading"

Schedule 13D form. No. 22-CV-2541 (TNM), 2023 WL 4824734, at *6 (D.D.C. July 27, 2023).

The defendant in that case argued that the plaintiff "c[ould] not bring a 10(b) claim based on a

misleading statement in a 13D." *Id.* at *7. However, the district court held that even if "[n]o private

right of action for damages exists under Section 13(d) . . . it does not follow that 10(b) claims may

not be based on misleading 13D filings." *Id.*[11] This Court agrees that "those are two separate

questions." *Id.*

Although the question of whether a Section 10(b) damages claim can be based on a

disclosure violation has not been squarely addressed by the Second Circuit, this Court is persuaded

by the Second Circuit's more recent decision in *Puddu I*, as well as other recent district court

decisions within and outside this Circuit. Therefore, the Court accepts that Plaintiff's Section 10(b)

---

[11] Although the district court of D.C. ultimately disagreed with the Second Circuit's holding in *Kamerman* concerning Section 18(a), *see In re Bed Bath & Beyond Corp. Sec. Litig.*, 2023 WL 4824734, at *7, this Court does not that reach that conclusion and finds, for the reasons explained above, that this decision today is consistent with both *Kamerman* and *Puddu II*.

claim may be based on Defendant Musk's alleged violation of his Section 13(d) disclosure obligations and the Court will now address Defendants' other arguments. [12]

### C. Plaintiff Has Adequately Plead Scienter

Defendants argue the Complaint does not adequately pleaded scienter.  Specifically, Defendants contend that the Complaint merely suggests that "inadvertence, oversight, or other non-culpable explanation is the far more compelling inference for the failure [to] timely [] disclose Musk's stake in Twitter" rather than a motive or intent to defraud. Mot. at 15. On the other hand, Plaintiff argues that the Complaint adequately pleads that Defendant Musk acted with scienter when: (1) he concealed his over-5% Twitter interest; and (2) he misrepresented his activist intentions. Opp. at 13.

To plead scienter under the PSLRA, a plaintiff must allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009); *see* 15 U.S.C. § 78u–4(b)(2)). The scienter required under Section 10(b) and Rule 10b–5 is "an intent to deceive, manipulate or defraud." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 234 (S.D.N.Y. 2022) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)). Recklessness may also suffice to plead scienter for securities fraud in the Second Circuit. *See ECA*, 553 F.3d at 198. As mentioned above, to allege a strong inference, the inference of scienter must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. In determining whether this inference exists, courts consider both the inferences urged by the plaintiff and any competing

---

[12] Defendants argue that the absence of a private right of action for damages under Section 10(b) for breaches of Section 13(d) disposes of Plaintiff's Section 10(b) and Section 20(a) claims. Mot. at 13 (citing *ATSI Commc'ns*, 493 F.3d at 108). Because the Court rejects this argument and Defendants make no other mention of Section 20(a), the Court provides no opinion on Plaintiff's Section 20(a) claim.

inferences rationally drawn from all the facts alleged, taken collectively. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 234 (citing *ECA*, 553 F.3d at 198); *Tellabs*, 551 U.S. at 323 ("the court must take into account plausible opposing inferences"). A plaintiff may establish scienter by alleging facts that either (1) show that the defendant had both the 'motive and opportunity' to commit the alleged fraud, or (2) constitute 'strong circumstantial evidence of conscious misbehavior or recklessness.'" *Francisco. Abengoa, S.A.*, 559 F. Supp. 3d 286, 317 (S.D.N.Y. 2021) (quoting *ECA*, 553 F.3d at 198).

"Scienter claims may be assessed 'holistically' when assessing whether a strong inference of fraudulent intent has been established." *Puddu I*, 2021 WL 1198666, at *11 (quoting *Setzer v. Omega Healthcare Inv'rs, Inc.*, 968 F.3d 204, 213 n.11 (2d Cir. 2020)). "At the motion to dismiss stage, a tie on scienter goes to the plaintiff." *Skiadas v. Acer Therapeutics Inc.*, No. 1:19-CV-6137-GHW, 2020 WL 3268495, at *10 (S.D.N.Y. June 16, 2020); *see also In re Insys Therapeutics, Inc. Sec. Litig.*, No. 17-CV-1954 (PAC), 2018 WL 2943746, at *6 (S.D.N.Y. June 12, 2018) ("[E]ven if the allegations of motive were weak, they can still support a strong inference of scienter when they are accompanied by 'extensive allegations of circumstantial evidence of recklessness and misconduct that strongly buttress the motive alleged.'" (citing *In re Silvercorp Metals, Inc. Sec. Litig*, 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014))).

For the reasons stated below, the Court finds that Plaintiff has adequately alleged scienter as to the alleged misrepresentation and omissions.

**1.  Plaintiff has Adequately Pleaded Scienter as to Defendant's Failure to Disclose his Over-5% Twitter Ownership Stake**

In the Complaint, Plaintiff alleges circumstantial evidence as to Defendant's failure to disclose his over-5% ownership stake in Twitter. Conscious misbehavior, "generally consists of deliberate, illegal behavior." *Woolgar v. Kingstone Companies, Inc.*, 477 F. Supp. 3d 193, 236–37 (S.D.N.Y.

2020) (quoting *In re Lululemon*, 14 F. Supp. 3d at 573). "Recklessness, on the other hand, can be adequately pleaded where the allegations show that defendants' conduct was 'highly unreasonable' and constituted 'an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id*. (quoting *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009). Circumstantial evidence of scienter includes evidence that defendant "(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015).

Plaintiff's allegations, taken together, sufficiently support an inference of scienter for Defendant Musk's nondisclosure of his ownership stake. Plaintiff alleges that Musk knew of his duty to disclose, specifically pointing to his sworn deposition testimony in an SEC enforcement action where he stated, "U.S. reporting requirements start at 5 percent." Compl. ¶¶ 6, 57, 114. Additionally, Plaintiff alleges that Musk's knowledge of Rule 13's disclosures requirements is demonstrated by the fact that, "since 2011, Musk has personally filed and signed twelve Schedule 13G forms and eight Schedule 13D forms for his companies." *Id*. ¶ 115. Moreover, Plaintiff alleges that Defendant knew that his Twitter ownership had crossed the 5% threshold because he held several non-public meetings during the Class Period where he specifically discussed his stake. Opp. at 14. For example, on both March 26 and March 27, 2022, Musk spoke with Mr. Durban, the Twitter Director, about "the potential of Mr. Musk joining the Twitter Board, as well as the fact that Mr. Musk had purchased a significant stake of more than five percent of [Twitter's] common stock." *Id.* ¶ 78 (quoting Proxy at 42). Additionally, when Defendant filed his Schedule

13G form, he confirmed March 14, 2022 as the "Date of Event" triggering his filing obligation. *Id*. ¶¶ 65, 85, 117.

Because "scienter can be sufficiently pleaded through 'facts that suggest [that defendants] knew they had a duty to disclose' information they withheld," the Court concludes that Plaintiff has adequately pleaded scienter at this stage. *In re Kirkland Lake Gold Ltd. Sec. Litig*., No. 20-CV-4953 (JPO), 2021 WL 4482151, at *4 (S.D.N.Y. Sept. 30, 2021). Plaintiff's allegations suffice to meet the circumstantial evidence prong.

Defendant proposes several individual opposing inferences. For example, Defendants contend that Plaintiff's assertion that Defendant Musk had successfully complied with Section 13(d) on 20 separate, prior occasions, Compl. ¶¶ 59, 115, his familiarity with Section 13(d) reporting, *id* ¶¶ 57, 114, and even his advice that others would have to follow those same requirements, *id*., call for the inference that "any failure was an aberration and unintentional." Mot. at 15. Defendants argue that Plaintiff's allegations that Musk is "famous for owning and controlling several high value tech companies", *id*. (quoting Compl. ¶ 23), supports this opposing inference because it implies that Musk is "one of the busiest people on the planet" and because Musk is so busy, Defendants assert that the "disclosure and filing requirements are . . . delegated" to others. *Id*. Therefore, Defendants argue, any failure to disclose the ownership stake was "unintentional." *Id*. However, the Complaint specifically alleges that Defendant Musk "personally signed and filed" the Schedule 13G on April 4, 2022, Compl. ¶¶ 89, 116, 128, and that he had done so multiple times in the past. *id*. ¶¶ 6, 59, 115. Therefore, it is unclear how Defendant's proposed opposing inference that the disclosure requirements were "in any case delegated"[13] is "plausible." *Tellabs*, 551 U.S. at 323 (in determining scienter, "the court must take into account plausible opposing inferences."). This

---

[13] Mot at 15.

inference is nether as cogent nor compelling as Plaintiff's inference of scienter, especially because it requires the Court to infer that Musk was somehow "too busy" to comply with SEC disclosure rules about his ownership stake in Twitter, while simultaneously buying millions of shares of stock of Twitter, tweeting about the state of Twitter as a social media platform, and meeting with several Twitter executives and insiders, Compl. ¶¶ 72–83, and this inference is in direct contravention of Plaintiff's factual allegation that Musk signed the disclosures himself. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020) ("this alternative explanation merely raises a factual dispute that the Court must resolve in plaintiff's favor at this stage and is therefore not enough to defeat this inference of scienter.").

Defendants also argue that the Complaint's allegation that Defendant Musk deleted the certification language and replaced it with the words "Not Applicable" on his April 4, 2022 Schedule 13G was not part of a "cover-up," Compl. ¶ 116, but instead that the act of deleting the certification of non-intent "alerted the market to potential control intentions" Reply at 7. Defendants further argue that in accordance with the Complaint's logic, the omission was necessary because its inclusion would have made the Schedule 13G form untrue. Mot. at 16. Defendants ask the Court to infer that taking out the certification language actually means that Plaintiff failed to plead the 13G form was misleading at all, must less intentionally. *Id*. Defendants seem to ignore the Complaint's allegation that filing a Schedule 13G form was misleading in the first place because it inherently signaled that Musk's interest was passive. Compl. ¶¶ 53, 87-89. Therefore, the inference of scienter in the Complaint is "at least as compelling as" Defendants' proposed opposing inference. *Tellabs*, 551 U.S. at 324.

Defendants also ask the Court to infer from the Complaint that Defendant Musk was actually forthcoming with his disclosures. Defendants point out that "Musk's quick, public

acknowledgment of the "date of event" is contrary to an inference that any failure to file the Schedule 13D was deliberate or omitted with fraudulent intent." Mot. at 16. Similarly, Defendants contend that Musk's alleged discussions with a Twitter director in which he purportedly acknowledged that his Twitter stake had exceeded 5% indicates that "the most compelling inference is that any failure to disclose was inadvertent." *Id.* (citing *Kuriakose v. Fed. Home Loan Mortg. Corp.*, 897 F. Supp. 2d 168, 185 (S.D.N.Y. 2012) *aff'd sub nom. Cent. States, Se. & Sw. Areas Pension Fund v. Fed. Home Loan Mortg. Corp.*, 543 F. App'x 72 (2d Cir. 2013).). In their Reply, Defendants elaborate that "had Musk sought to conceal his acquisition, he would not have openly discussed it with executives of the issuer." Reply at 9. In *Kuriakose*, the court held that it would "def[y] logic to conclude that executives who are seeking to perpetuate fraudulent information upon the market would make such fulsome disclosures." *Kuriakose*, 897 F. Supp. 2d at 185. The court additionally held that the defendant in that case "made extensive disclosures about its investments throughout the Class Period" and that the defendant's "method of disclosing information made it possible for a reasonable investor to, with little effort, take his own measure of risk." *Kuriakose*, 897 F. Supp. 2d at 182. Here, however, it is unclear how Musk's *private* conversations with Twitter executives could be construed, at this stage, as "extensive" or "fulsome" disclosures to Twitter's investors throughout the Class Period. Thus, this argument also fails.

Defendants also point to the Complaint's "contradictory" allegations that Musk has both a history of "reckless disregard and disdain for SEC regulations", Compl. ¶ 121, and prior compliance with Section 13(d) and SEC Rule 13d-1(a), *see id.* ¶¶ 57-59. Defendants argue that the Complaint cannot rely on both sets of allegations to bolster Plaintiff's scienter allegations. Defendants ask the Court to neither reconcile nor accept these allegations. However, the Court is

not convinced. Plaintiff points to Musk's past violations and disparaging comments about the SEC to support its inference of scienter as to Defendant's refusal to disclose his ownership stake. Compl. ¶¶ 3, 27–39, 121. Plaintiff need not allege that Defendant Musk violates every SEC law or rule at every moment for these allegations to comport with each other. Opp. at 21. Although Musk's past compliance with Section 13(d) as an isolated allegation may support an opposing inference that his failure to disclose was inadvertent, the Court concludes that a "reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

Thus, the Court has considered the opposing inferences proposed by Defendants, but nonetheless concludes that "taken together, and even in light of opposing inferences, the Complaint's allegations articulate Defendants' [scienter.]" *Employees' Ret. Sys. of Gov't of the Virgin Islands*, 794 F.3d at 309.

### 2. Plaintiff has Adequately Pleaded Scienter as to Defendant's Schedule 13G Form and Failure to disclose his Activist Interest in Twitter

Plaintiff also points to circumstantial evidence as to Defendant's alleged misleading Schedule 13G form and failure to disclose his intent to change or influence the control of Twitter. Plaintiff's allegations, taken together, sufficiently support an inference of scienter as to Defendant's allegedly misleading Schedule 13G form and failure to disclose his activist interest via a Schedule 13D form.

Plaintiff alleges that Defendant Musk embarked on a campaign to join Twitter's Board of Directors while amassing more than 5% ownership stake in Twitter. Compl. ¶¶ 76–83. Defendant's alleged campaign included multiple meetings with Twitter executives during the Class Period. *Id.* ¶¶ 76-81, 120. For example, on March 26, 27, and 31, Musk communicated with multiple Twitter insiders about, *inter alia*, the potential of "Mr. Musk joining the Twitter Board." *Id.* ¶¶ 78-80. The Complaint alleges that Musk discussed "tak[ing] Twitter private." *Id.* ¶¶ 79, 120. The Complaint

alleges that Musk was invited to join the Twitter Board on April 3, 2022, the day before he filed the Schedule 13G Form, which the Complaint alleges is reserved for passive investors who pass a 5% ownership stake. *Id*. ¶¶ 4, 53, 84-5, 87, 128. The Complaint alleges that the SEC was investigating Musk regarding his failure to timely file a Schedule 13D form. *Id*. ¶ 97.[14]

Defendants argue that Plaintiff has failed to plead that Defendant Musk formed any intent to control or acquire Twitter during the class period, which is required before filing a Schedule 13D form. Defendants specifically assert that the Complaint itself makes clear that Musk did not settle on a course concerning his board membership at Twitter until the end of the Class Period. *See* Reply at 5. Defendants point to Musk's tweets about creating a rival platform, Compl. ¶¶ 74-75, 77, Plaintiff's reliance on an "unspecified document", *id*. ¶ 81, his offer to "help" Twitter, *id*. ¶ 77 his alleged discussions about "potentially" joining Twitter's board and that he was "considering various options." *Id*. ¶¶ 78-80.

Defendants appear to propose an opposing inference based on Plaintiff's allegations. The Court, again, is not convinced. The Complaint suggests no facts that Defendant Musk took any steps to build a different platform—in fact, the Complaint alleges that Musk was engaged in public misdirection on Twitter while simultaneously buying millions of shares of Twitter stock and meeting with Twitter executives. Compl. ¶¶ 72, 76. The Complaint also alleges that on March 31, 2022, Musk determined he wanted to buy Twitter. The Complaint points to a March 31, 2022 document, Musk's several meetings with Twitter executives, and his eventual disclosure via a Schedule 13D form on April 5, 2022. For these reasons, the Court concludes that Plaintiff's allegations are enough to pass the particularity threshold. Defendants raise a factual dispute about

---

[14] Again, because "scienter can be sufficiently pleaded through 'facts that suggest [that defendants] knew they had a duty to disclose' information they withheld," the Court concludes that Plaintiff has adequately pleaded scienter at this stage. *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2021 WL 4482151, at *4.

when exactly Defendant Musk decided to change or influence the control of Twitter that the Court must resolve in Plaintiff's favor at this stage and is therefore not enough to defeat inference of scienter. C*ity of Warren Police & Fire Ret. Sys. v. World Wrestling Ent. Inc.*, 477 F. Supp. 3d 123, 137 (S.D.N.Y. 2020).

At least at this juncture, considering the other circumstantial evidence presented by Plaintiff, the allegation that Defendant Musk was obligated to file the Schedule 13D—and opted not to do so—is enough to adequately plead a material omission and misstatement for purposes of Plaintiff's Section 10(b) claim.

### D. Plaintiff Has Adequately Pleaded Loss Causation

Defendants also argue that Plaintiff has failed to allege loss causation. They argue that Plaintiff's allegations concerning loss causation are "pure speculation." Mot. at 20. "To establish loss causation, Plaintiffs must show that 'the subject of the fraudulent statement or omission was the cause of the actual loss suffered.'" *Abramson v. Newlink Genetics Corp*., 965 F.3d 165, 179 (2d Cir. 2020) (quoting *In re Vivendi, S.A. Securities Litigation*, 838 F.3d at 261). A plaintiff may show loss causation by alleging "either (1) the existence of a cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud or (2) that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement." *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d at 256 (internal citations and quotation marks omitted). "The loss causation pleading standard is 'not meant to impose a great burden upon a plaintiff.'" *In re EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 211 (S.D.N.Y. 2016) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)).

Plaintiff alleges that Musk's material omissions and misstatement artificially depressed the price of Twitter's securities, and, when the truth was revealed, it caused the price of Twitter's stock

to increase nearly 40%. Opp. at 23; Compl. ¶¶ 94, 130-32. Additionally, the Complaint alleges that the filing of a Schedule 13D form drives up the price of a target company's securities. Compl. ¶¶ 47–49. Therefore, according to Plaintiff, had Musk not hidden his ownership, investors would have traded at a higher price during the Class Period. *Id.* ¶ 132. Thus, Plaintiff's allegations support its theory of loss causation at this juncture. *See Gruber*, 2018 WL 1418188, at *8 (Plaintiff "may prove loss causation by showing that the defendants' misrepresentations [and omissions] induced a disparity between the transaction price and the true investment quality of the securities").

## II.     Insider Trading Claim

Lead Plaintiff brings a claim for insider trading against Defendants Musk and the Trust pursuant to Section 20A of the Exchange Act. "To establish such a claim, [plaintiff] must (1) plead a predicate insider trading violation of the Exchange Act, and (2) allege sufficient facts showing that the defendant traded the security at issue contemporaneously with the plaintiff." *In re Aegean Marine Petroleum Network, Inc. Sec. Litig.*, 529 F. Supp. 3d at 175.

"The first factor requires plaintiff to allege 'unlawful trading in securities based on material non-public information ["MNPI"]'" *Id.* (quoting *Gruber v. Gilbertson*, No. 16CV9727, 2019 WL 4458956, at *2 (S.D.N.Y. Sept. 17, 2019)). This can be established in two ways. First, "[u]nder the traditional or classical theory of insider trading, a corporate insider is prohibited from trading shares of that corporation based on material non-public information in violation of the duty of trust and confidence insiders owe to shareholders." *Id.* The "second theory, grounded in misappropriation, targets persons who are not corporate insiders but to whom material non-public information has been entrusted in confidence and who breach a fiduciary duty to the source of the information to gain personal profit in the securities market." *Gruber*, 2019 WL 4458956, at *2 (quoting *SEC v. Obus*, 693 F.3d 276, 284 (2d Cir. 2012)).

Plaintiff alleges that Musk purchased shares of Twitter common stock while in possession of material, nonpublic information concerning his ownership of Twitter common stock and intentions for Twitter which he omitted to disclose. Compl. ¶¶ 151–157. Plaintiff argues that Musk was a "temporary insider trading on MNPI" who violated the duty of trust and confidence he owed to Twitter's shareholders and its Board. Opp. at 25.

According to the Second Circuit, a temporary insider is an individual or group of individuals who have "entered into a special confidential relationship in the conduct of the business of the enterprise and are given access to information solely for corporate purposes." *U.S. v. Kosinski*, 976 F.3d 135, 144 (2d Cir. 2020) (quotation omitted). Examples of such insiders would include "underwriter[s], accountant[s], lawyer[s], or consultant[s]." *Id*. Temporary insiders are "forbidden from trading under both the classical and misappropriation theories without the requisite disclosure." *Id*. at 145.

In *Kosinski*, the defendant found to be a temporary insider had signed a confidentiality disclosure agreement and served as a "principal investigator" of a clinical trial for a drug developed by the company whose stock he was trading based on the MNPI that the clinical trial would be suspended. *Id*. at 135, 145. In *Gruber,* another case cited by Plaintiff, the defendant "was the quintessential insider who made every material decision for the Company." *Gruber*, 2018 WL 1418188, at *17.

Plaintiff points to Defendant Musk's meetings and communications with Twitter executives to support its allegation that he was a temporary insider. Opp. at 24. Although, as explained previously, Plaintiff adequately pleaded that Defendant Musk failed to disclose his intention to influence or control Twitter, it is unclear that Plaintiff's allegations that Musk met with Twitter executives to discuss his ownership stake and his plan to join the Board and plans for the Company

is enough to properly allege he was a temporary insider. Plaintiff, for example, makes no allegation that Musk entered into a confidentiality agreement or that he made material decisions for the Company. Additionally, Plaintiff makes no argument under the misappropriation theory in its opposition, and therefore the Court will not consider this theory.  Because Plaintiff fails to plead Musk was an insider for purposes of its Section 20A claim, Plaintiff cannot meet the first element of a Section 20A claim. Therefore, this claim is dismissed.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is **DENIED in part and GRANTED in part.** Count II (insider trading) is dismissed. Additionally, Plaintiff's motion for oral argument is **DENIED**. The parties are hereby **ORDERED** to file a joint status report on the proposed next steps in this matter on or by **October 10, 2023**. The Clerk of the Court is respectfully directed to terminate the open motions at ECF No. 40 and 47.

**SO ORDERED.**

Dated:      September 29, 2023
            New York, New York

_____

**ANDREW L. CARTER, JR.**
**United States District Judge**

41

**EXHIBIT B**

United States Securities and Exchange Commission Application for Order
Compelling Compliance with Administrative Subpoena Dated October 5, 2023

1  MELISSA ARMSTRONG (Tex. Bar No. 24050234)
     ArmstrongMe@sec.gov
2  100 F Street, NE
    Washington, DC 20549
3  Telephone: (202) 551-4724
    Facsimile: (703) 772-9292
4
    MONIQUE WINKLER (Cal. Bar No. 213031)
5  BERNARD B. SMYTH (Cal. Bar No. 217741)
     SmythB@sec.gov
6  ROBIN ANDREWS (Ill. Bar No. 6285644)
     AndrewsR@sec.gov
7  44 Montgomery Street, Suite 2800
    San Francisco, CA 94104
8  Telephone: (415) 705-2500
    Facsimile: (415) 705-2501
9
    Attorneys for Applicant
10  Securities and Exchange Commission

11

12                 **UNITED STATES DISTRICT COURT**

13              **NORTHERN DISTRICT OF CALIFORNIA**

14                  **SAN FRANCISCO DIVISION**

15

16
    SECURITIES AND EXCHANGE COMMISSION,          Misc. No.
17
                        Applicant,
18
              v.                                 **SECURITIES AND EXCHANGE**
19                                               **COMMISSION'S NOTICE AND**
    ELON MUSK,                                   **APPLICATION FOR AN ORDER**
20                                               **COMPELLING COMPLIANCE**
                        Respondent.              **WITH AN ADMINISTRATIVE**
21                                               **SUBPOENA AND**
                                                 **MEMORANDUM IN SUPPORT**
22
                                                 Date Filed:      October 5, 2023
23
                                                 Hearing Date:  November 9, 2023
24

25

26

27

28

# **TABLE OF CONTENTS**

NOTICE AND APPLICATION ..................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................. 2

I.     INTRODUCTION ......................................................... 2

II.    STATEMENT OF FACTS ................................................ 3

      A.    The SEC's Investigation and Respondent's Involvement ................... 3

      B.    The SEC's May 2023 Subpoena to Respondent ...................... 4

      C.    Respondent's Failure to Comply with the SEC's Subpoena ............... 5

III.   ARGUMENT ............................................................ 6

      A.    This Court Has Jurisdiction to Enforce the SEC's Validly
           Issued Administrative Subpoena in a Summary Proceeding ............... 6

      B.    The SEC's Administrative Subpoena to Musk Should Be
           Enforced ............................................................ 7

      C.    Musk Has No Valid Basis for Failing to Comply with the
           SEC's Subpoena ................................................... 10

IV.   CONCLUSION ......................................................... 12

1

**TABLE OF AUTHORITIES**

2

3

**CASES**

4  *Administrator, US EPA v. Alyeska Pipeline Serv. Co.*, 836 F.2d 443 (9th Cir. 1988) ......................... 9

5  *EEOC v. Fed. Exp. Corp.*, 558 F.3d 842 (9th Cir. 2009) ......................................................... 9

6

7  *EEOC v. St. Regis Paper Co.-Kraft Div.*, 717 F.2d 1302 (9th Cir. 1983) ............................. 6

8  *Endicott Johnson v. Perkins,* 317 U.S. 501 (1943) ............................................................. 9

9  *Flatt v. SEC,* Case No. 10-60073-MC, 2010 WL 1524328 (S.D. Fla. Apr. 14, 2010) ....................... 8

10  *Gewerter v. SEC,* Case No. 16-02556-PHX, 2016 WL 4074117 (D. Ariz. July 29, 2016) ................. 9

11

12  *Nelson v. SEC,* Case No. 08-80080-JF, 2008 WL 2444794 (N.D. Cal. June 16, 2008) ..................... 9

13  *RNR Enters., Inc. v. SEC*, 122 F.3d 93 (2d Cir. 1997) ............................................................. 7

14  *Rosiere v. SEC*, Case No. 09-01975-JCM, 2010 WL 489526 (D. Nev. Feb. 5, 2010) ....................... 8

15  *Sansend Fin. Consultants Ltd. v. Fed. Home Loan Bank Bd.*, 878 F.2d 875 (5th Cir. 1989) ............. 8

16

17  *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512 (9th Cir. 1980) ................................... 7, 10

18  *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047 (2d Cir. 1973) .......................... 7, 10

19  *SEC v. Custodian of Records R.R. Donnelley & Sons Co.*, Case No. 12-07331-SVW,
   2012 WL 12930953 (C.D. Cal. Oct. 11, 2012) ................................................. 6, 7

20

21  *SEC v. Harman Wright Group, LLC,* Case No. 18-00190-CMA,
   2018 WL 6102758 (D. Colo. Nov. 21, 2018) ................................................. 7, 9

22  *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735 (1984) ............................................................. 8

23

24  *SEC v. McCarthy*, 322 F.3d 650 (9th Cir. 2003) ............................................................. 6

25  *SEC v. Musk,* Case No. No. 22-1291, 2023 WL 3451402 (2d Cir. May 15, 2023) .......................... 11

26  *SEC v. Obioha,* Case No. 12-80109-WHA, 2012 WL 4889286 (N.D. Cal. Oct. 12, 2012) ................. 7

27  *SEC v. Sprecher,* 594 F.2d 317 (2d Cir. 1979) ............................................................. 6

28

*SEC v. Tajyar,* Case No. 18-00113-DMG, 2018 WL 6313475 (C.D. Cal. Oct. 15, 2018) ................... 7

*United States v. Morton Salt Co.,* 338 U.S. 632 (1950) ............................................................... 8

*United States v. Jose,* 131 F.3d 1325 (9th Cir. 1997) ............................................................ 7, 10

*United States v. Powell,* 379 U.S. 48 (1964) ........................................................................... 7

**REGULATIONS**

17 C.F.R § § 200.30-4(a)(1)......................................................................................... 10

**STATUTES**

15 U.S.C. § 77s(b) ...................................................................................................... 3

15 U.S.C. § 77s(c) .................................................................................................... 10

15 U.S.C. § 77t(a) ...................................................................................................... 8

15 U.S.C. § 77u(b) .................................................................................................... 10

15 U.S.C. § 77v(b) ................................................................................................... 1, 6

15 U.S.C. § 78u(b) ............................................................................................... 3, 8, 11

15 U.S.C. § 78u(c) ................................................................................................... 1, 6

## **NOTICE AND APPLICATION**

PLEASE TAKE NOTICE that on November 9, 2023 at 1:30 p.m., or as soon thereafter as the matter can be heard, in the courtroom of the assigned General Duty Judge located at 450 Golden Gate Avenue, San Francisco, California, Applicant Securities and Exchange Commission will and hereby does apply for an order compelling Respondent Elon Musk to comply with the administrative subpoena issued by Applicant.

This is an administrative subpoena enforcement action. The Court has jurisdiction under Section 22(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77v(b), and Section 21(c) of the Securities and Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(c). Venue is appropriate under Section 22(a) of the Securities Act, 15 U.S.C. § 77v(b), and Section 21(c) of the Exchange Act, 15 U.S.C. § 78u(c). This application is based on Respondent's failure to comply with a valid administrative subpoena without excuse. This application is supported by the accompanying Memorandum of Points and Authorities, the Declaration of Robin Andrews in support thereof, the proposed order, and such further evidence and argument as the Court may consider.

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.    <u>INTRODUCTION</u>

The Securities and Exchange Commission ("SEC" or "Commission") asks this Court to compel Respondent Elon Musk to appear for investigative testimony pursuant to an SEC investigative subpoena.

Musk failed to appear for testimony on September 15, 2023, as required by the investigative subpoena served by the SEC, despite (1) in May 2023, agreeing to appear for testimony on a date nearly four months later, in September 2023, (2) having been served with a subpoena in May 2023 requiring his appearance for testimony in the SEC's San Francisco Regional Office on that mutually agreed upon date in September, (3) raising no objection to the subpoena at the time it was served or during the following months, and (4) approximately two weeks before his scheduled testimony, requesting and receiving an accommodation to move his scheduled testimony by one day. Instead, two days before his scheduled testimony, Musk abruptly notified the SEC staff that he would not appear. Musk attempted to justify his refusal to comply with the subpoena by raising, for the first time, several spurious objections, including an objection to San Francisco as an appropriate testimony location.

Notwithstanding the specious nature of Musk's untimely objections, the SEC staff attempted to negotiate in good faith with Musk to find an alternative date and location for his testimony. The SEC staff offered to conduct Musk's testimony at the SEC's Fort Worth, Texas office (the closest SEC office to Musk's current personal residence) or any other of the Commission's offices, and proposed multiple dates in October and November 2023. These good faith efforts were met with Musk's blanket refusal to appear for testimony.

The subpoena with which Musk failed to comply relates to an ongoing nonpublic investigation by the SEC regarding whether, among other things, Musk violated various provisions of the federal securities laws in connection with (1) his 2022 purchases of Twitter,

Inc. ("Twitter")[1] stock, and (2) his 2022 statements and SEC filings relating to Twitter. As described below, the SEC seeks Musk's testimony to obtain information not already in the SEC's possession that is relevant to its lawful investigation. The SEC has followed all appropriate administrative steps required in seeking Musk's testimony. In the face of Musk's blatant refusal to comply with the SEC's subpoena, the SEC now asks the Court to intervene and compel Musk's compliance.

## II.    STATEMENT OF FACTS

### A.    The SEC's Investigation and Respondent's Involvement

On April 14, 2022, the Commission issued an Order Directing Private Investigation and Designating Officers to Take Testimony in an investigation titled *In the Matter of Certain Purchases, Sales and Disclosures of Twitter Shares* (SEC File No. SF-4519) ("Formal Order"). *See* Declaration of Robin Andrews ("Andrews Decl."), ¶¶ 2, 5. On July 15, 2022, the Commission issued a Corrected Order Directing Private Investigation and Designating Officers to Take Testimony ("Corrected Formal Order") in that same investigation. Among other things, the Formal Order and Corrected Formal Order authorize the SEC staff to investigate whether any persons or entities may have violated the federal securities laws in connection with Musk's 2022 purchases of Twitter's stock, and his 2022 statements and SEC filings relating to Twitter. Andrews Decl., ¶ 3. The Formal Order and Corrected Formal Order also designate and authorize certain SEC staff to issue subpoenas in this investigation, to obtain documents, and to take testimony. *See id.*, ¶ 5; 15 U.S.C. §§ 77s(b), 78u(b).

As part of its investigation in this matter, in June 2022, the SEC served Musk with a subpoena seeking his testimony. Andrews Decl., ¶ 6. On July 12, 2022 and July 27, 2022, Musk appeared for half-day sessions of testimony by videoconference. *Id.* Since Musk's last half-day of testimony on July 27, 2022, the Commission has received thousands of new documents from

---

[1] Musk acquired Twitter through X Holding Corp., a corporation that he established. He subsequently renamed Twitter, X Corp. As the conduct at issue in the SEC's investigation involves the period in which Twitter was a publicly traded stock, this memorandum refers to the company as Twitter.

1  various parties as part of its investigation, including hundreds of new documents produced by

2  Musk. *Id.*, ¶ 7. Indeed, nearly half of the documents Musk has produced to the Commission in its

3  investigation were produced after Musk's last half-day session of testimony, including

4  documents Musk authored. *Id.* The SEC has not yet had an opportunity to question Musk about

5  those documents and other substantial information it has obtained in its investigation since July

6  27, 2022.

7      **B.    The SEC's May 2023 Subpoena to Respondent**

8          In light of the substantial new information the SEC obtained following Musk's last half-

9  day session of testimony, in April 2023, the SEC staff discussed with Musk's counsel the need

10  for Musk to appear for another day of testimony. *Id.*, ¶ 8. The SEC staff informed Musk's

11  counsel at that time that it intended to subpoena Musk for testimony in person at the SEC's San

12  Francisco Regional Office. *Id.* Although Musk's counsel informed the SEC staff of certain

13  scheduling conflicts between June and early August 2023, at no point during the April 2023

14  conversation did Musk's counsel object either to Musk's appearance for another day of

15  testimony or to having the testimony conducted in person in San Francisco. *Id.*

16          After multiple communications between the SEC staff and Musk's counsel in May 2023,

17  on May 23, 2023, Musk's counsel agreed that Musk would appear for investigative testimony on

18  September 14, 2023. *Id.*, ¶ 9. Later that same day, the SEC served a subpoena on Musk requiring

19  his attendance for testimony at the SEC's San Francisco Regional Office on September 14, 2023.

20  *Id.*, ¶ 9, Ex. 2. Musk did not raise any objection to the subpoena after having been served with it

21  on May 23, 2023. *Id.*, ¶ 10.

22          On August 28, 2023, just over two weeks prior to the September 14, 2023 date for

23  Musk's testimony, Musk's counsel requested that the SEC move Musk's testimony date from

24  September 14, 2023 to September 15, 2023. *Id.*, ¶ 11. In requesting that Musk's testimony be

25  moved a day, Musk's counsel raised no objection to Musk appearing for testimony or to San

26  Francisco as the location for Musk's testimony. *Id.* The SEC staff agreed to Musk's requested

27  accommodation and served him with a new subpoena requiring Musk to appear for testimony at

28

the SEC's San Francisco Regional Office on September 15, 2023. *Id.*, Ex. 3. Between August 28, 2023 and September 13, 2023, Musk raised no objection to the subpoena, including as to the date or location of Musk's testimony. *Id.*, ¶ 12.

### C. Respondent's Failure to Comply with the SEC's Subpoena

On September 13, 2023, Musk's counsel sent a letter informing SEC staff for the first time that Musk would not appear for testimony on September 15, 2023, as previously agreed. *Id.*, ¶ 13, Ex. 4. Musk's counsel also raised certain objections to the SEC's subpoena for the first time, including an objection to San Francisco as the location for testimony. *Id.*

On September 14, 2023, the SEC responded to Musk's letter and addressed Musk's stated objections. *Id.*, ¶ 14, Ex. 5. On September 15, 2023, Musk failed to appear for his testimony as required by the SEC's subpoena. *Id.*

Following Musk's failure to comply with the SEC's subpoena, the SEC attempted to negotiate a new date for Musk's testimony. On September 19, 2023, the SEC sent an email to Musk's counsel offering to conduct Musk's testimony on certain dates in October 2023. *Id.*, ¶ 15, Ex. 6. As one of Musk's stated objections was that the testimony was scheduled for San Francisco – where, he complained, he "does not live" – the SEC also offered to conduct Musk's testimony at the Commission's Fort Worth, Texas office (the closest office to Musk's residence) or any of the other Commission offices across the country (there are eleven). *Id.*, ¶¶ 13, 15, Exs. 4, 6. On September 21, 2023, the SEC offered potential testimony dates in November 2023, in addition to the dates in October 2023 that the SEC had already offered. *Id.*, ¶ 16, Ex. 7.

On September 24, 2023, Musk's counsel responded by informing the SEC that Musk would not appear for testimony in any location. *Id.*, ¶ 17, Ex. 8. The next day, the SEC sent a letter to Musk's counsel asking that Musk inform the Commission by September 29, 2023, if he had reconsidered and would agree to appear for testimony. *Id.*, ¶ 18, Ex. 9. Musk did not do so. *Id.*

### III.    ARGUMENT

Musk's ongoing refusal to comply with the SEC's administrative subpoena is hindering and delaying the SEC staff's investigation to determine whether violations of the federal securities laws have occurred. Accordingly, the SEC now asks the Court to compel Musk to appear for investigative testimony.

**A.    This Court Has Jurisdiction to Enforce the SEC's Validly Issued Administrative Subpoena in a Summary Proceeding**

When a subpoenaed party, such as Musk, refuses to comply with an SEC administrative subpoena issued in the course of an investigation, the SEC is authorized to seek a court order compelling compliance. *See* 15 U.S.C. §§ 77v(b), 78u(c). Section 22(b) of the Securities Act of 1933 ("Securities Act") and Section 21(c) of the Securities Exchange Act of 1934 ("Exchange Act") specifically grant jurisdiction over these subpoena enforcement actions to district courts.

Moreover, an SEC subpoena enforcement action may be brought in any federal court "within the jurisdiction of which such investigation or proceeding is carried on." 15 U.S.C. § 78u(c); *see also* 15 U.S.C. § 77v(b). This Court is therefore the proper venue for this subpoena enforcement action because the Commission's San Francisco Regional Office is conducting the investigation at issue. *See SEC v. Custodian of Records R.R. Donnelley & Sons Co.*, Case No. 12-07331-SVW, 2012 WL 12930953, at *1 (C.D. Cal. Oct. 11, 2012) (holding U.S. District Court for Central District of California was a proper court to consider subpoena enforcement action in investigation conducted by the SEC's Los Angeles Regional Office).

The court may grant an application to enforce an investigative subpoena in a summary proceeding. *EEOC v. St. Regis Paper Co.-Kraft Div.*, 717 F.2d 1302, 1304 (9th Cir. 1983) ("[a] subpoena enforcement action is a summary procedure" with no discovery absent "exceptional circumstances"); *see also SEC v. McCarthy*, 322 F.3d 650, 655-59 (9th Cir. 2003) (explaining that Section 21(e) of the Exchange Act permits the court to enforce an SEC subpoena in a summary proceeding "upon application from the Commission"); *SEC v. Sprecher*, 594 F.2d 317, 319-20 (2d Cir. 1979) (Section 22(b) of the Securities Act permits courts to enforce a subpoena

in summary proceeding "upon application by the Commission"). This summary procedure, rather than an action instituted by complaint, is appropriate because investigative agencies, like the SEC, "must be free without undue interference or delay to conduct an investigation which will adequately develop a factual basis for a determination as to whether particular activities come within the Commission's regulatory authority." *SEC v. Brigadoon Scotch Distributing Co.*, 480 F.2d 1047, 1053 (2d Cir. 1973). This Court may therefore rule upon the SEC's application in a summary show cause proceeding.

### B. The SEC's Administrative Subpoena to Musk Should Be Enforced

An administrative agency's investigative subpoena should be judicially enforced if the following criteria are met: (1) the SEC's "investigation will be conducted pursuant to a legitimate purpose," (2) the subpoena seeks information that "may be relevant to that purpose," (3) "the information sought is not already within the [SEC's] possession," and (4) all "administrative steps required . . . have been followed." *United States v. Powell*, 379 U.S. 48, 57-58 (1964) (enforcing IRS subpoena); *see also United States v. Jose*, 131 F.3d 1325, 1327-28 (9th Cir. 1997) (quoting *Powell*); *SEC v. Blackfoot Bituminous, Inc.*, 622 F.2d 512, 513-14 (9th Cir. 1980). Indeed, courts routinely grant relief in SEC subpoena enforcement proceedings upon the requisite showing. *See, e.g.*, *R.R. Donnelley & Sons*, 2012 WL 12930953; *SEC v. Tajyar*, Case No. 18-00113-DMG, 2018 WL 6313475 (C.D. Cal. Oct. 15, 2018), *adopted by* 2018 WL 6308106 (C.D. Cal. Nov. 30, 2018); *SEC v. Obioha*, Case No. 12-80109-WHA, 2012 WL 4889286 (N.D. Cal. Oct. 12, 2012). A declaration from a government official is sufficient to establish that the *Powell* requirements have been met. *See RNR Enters. v. SEC*, 122 F.3d 93, 97 (2d Cir. 1997); *see also SEC v. Harman Wright Group, LLC*, Case No. 18-00190-CMA, 2018 WL 6102758, at *2 (D. Colo. Nov. 21, 2018) (clarifying that the SEC's burden is a "slight one" generally satisfied by an affidavit from the agent seeking enforcement).

In this case, all of the requirements are met for enforcement of the SEC's subpoena. First, the SEC's investigation is being conducted pursuant to a lawfully authorized and legitimate purpose. "The provisions vesting the SEC with power to issue and seek enforcement of

subpoenas are expansive." *SEC v. Jerry T. O'Brien, Inc.*, 467 U.S. 735, 743 (1984); *see also*

*United States v. Morton Salt Co.*, 338 U.S. 632, 642-43 (1950). When Congress created the SEC

and assigned it the responsibility of protecting investors, it gave the SEC broad authority to

conduct investigations. *O'Brien, Inc.*, 467 U.S. at 741. This authority includes the power to

"subpoena witnesses, compel their attendance, take evidence, and require the production of any

books, papers, correspondence, memoranda, or other records which the Commission deems

relevant or material to the inquiry." 15 U.S.C. § 78u(b); *see also* 15 U.S.C. § 77t(a).

Here, the SEC has exercised its broad statutory authority and authorized the SEC staff to

investigate, among other things, whether provisions of the federal securities laws have been

violated in connection with Musk's 2022 purchases of Twitter stock and his 2022 statements and

SEC filings relating to Twitter. Andrews Decl., ¶ 3. The SEC authorized this investigation by

issuing a Formal Order on April 14, 2022. *Id.*, ¶ 5. The Commission issued a Corrected Formal

Order on July 15, 2022. *Id.* The SEC's investigation and the subpoena issued to Musk are

unquestionably within the scope of the Formal Order, Corrected Formal Order, and the SEC's

authorized law-enforcement powers.

Second, the information sought by the SEC's subpoena is relevant to the SEC's

investigation. The subpoena seeks the testimony of Musk so that the Commission may obtain

information from him regarding his 2022 purchases of Twitter stock and his 2022 statements and

SEC filings relating to Twitter. Musk's testimony on those subjects is plainly relevant to the

Commission's investigation. Moreover, in the context of an administrative investigation, "the

notion of relevance is a broad one. An agency can investigate merely on the suspicion that the

law is being violated, or even just because it wants assurance that it is not. So long as the material

requested *touches* a matter under investigation, an administrative subpoena will survive a

challenge that the material is not relevant." *Flatt v. SEC*, Case No. 10-60073-MC, 2010 WL

1524328, at *5 (S.D. Fla. Apr. 14, 2010) (quoting *Sansend Fin. Consultants Ltd. v. Fed. Home

Loan Bank Bd.*, 878 F.2d 875, 882 (5th Cir. 1989)); *see also Rosiere v. SEC*, Case No. 09-01975-

JCM, 2010 WL 489526 (D. Nev. Feb. 5, 2010); *Gewerter v. SEC*, Case No. 16-02556-PHX, 2016 WL 4074117, at *2 (D. Ariz. July 29, 2016).

The relevance required to enforce an investigative subpoena is much broader than in litigation. *See Nelson v. SEC*, Case No. 08-80080-JF, 2008 WL 2444794, at *2 (N.D. Cal. June 16, 2008). For that reason, as the Ninth Circuit has explained, "The scope of the judicial inquiry in an . . . agency subpoena enforcement proceeding is quite narrow." *EEOC v. Fed. Exp. Corp.*, 558 F.3d 842, 848 (9th Cir. 2009) (internal quotation marks and citations omitted). Thus, a court must enforce an administrative subpoena unless the evidence sought by the subpoena is plainly incompetent or irrelevant to any lawful purpose of the agency. *Id.* at 854; *see also Endicott Johnson v. Perkins*, 317 U.S. 501, 509 (1943); *Administrator, US EPA v. Alyeska Pipeline Serv. Co.*, 836 F.2d 443, 447 (9th Cir. 1988); *Harman Wright Group*, 2018 WL 6102758, at *2.

The minimal relevance required to enforce the administrative subpoena served on Musk is easily satisfied here. The SEC's investigation here pertains to purchases of securities by Musk and statements and SEC filings made by Musk relating to his purchases of securities. The subpoena seeks Musk's testimony so that the SEC staff may question Musk on those topics. Because he is the very individual who made the securities purchases, statements, and filings at issue, the SEC's subpoena for Musk's testimony meets the relevance requirement.

Third, the information sought pursuant to the SEC's subpoena is not in the SEC's possession. Musk has not appeared for testimony in this investigation since July 2022 when he appeared for two separate half-day sessions. Andrews Decl., ¶ 6. Since that time, the SEC has received thousands of new documents from various parties as part of its investigation, including hundreds of documents produced by Musk. *Id.*, ¶ 7. Nearly half of the documents produced to the Commission by Musk in this investigation were produced after Musk's prior investigative testimony over a year ago, including documents Musk authored. *Id.* The SEC has therefore not yet had the opportunity to question Musk regarding, among other things, the information contained in those documents.

Fourth, the SEC has satisfied all administrative prerequisites. The federal securities laws authorize the SEC to compel the attendance of witnesses that the SEC deems relevant or material to its investigation. *See* 15 U.S.C. §§ 77s(c), 77u(b). Here, the SEC's subpoena was issued pursuant to a Corrected Formal Order and signed by an SEC attorney who is specifically designated by the Corrected Formal Order to issue subpoenas. *See* 17 C.F.R. § 200.30-4(a)(1). The SEC served Musk with the subpoena and Musk's attorney confirmed that he received the subpoena. Nevertheless, Musk refuses to make himself available for testimony as the subpoena requires.

### C. Musk Has No Valid Basis for Failing to Comply with the SEC's Subpoena

Because the SEC has established that its subpoena was lawfully issued, the burden shifts to Respondent to establish an affirmative defense for failing to comply with the subpoena. Musk bears a heavy burden where, as here, "the agency inquiry is authorized by law and the [information] sought [is] relevant to the inquiry." *Brigadoon Scotch Dist. Co.*, 480 F.2d at 1056; *see also United States v. Jose*, 131 F.3d at 1328 (after *prima facie* case made to enforce investigative summons, heavy burden fell on respondent); *Blackfoot Bituminous*, 622 F.2d at 515 (respondent has burden of showing a defense to enforcement).

Musk cannot meet this high burden. He did not raise any objection to the SEC's subpoena until only two days prior to the date he was to appear for testimony. He then raised, for the first time, a total of five objections. Andrews Decl., ¶ 13, Ex. 4. Not only are Musk's stated objections untimely, they are without merit.

First, Musk objected on the basis that Musk "has already sat for testimony twice in this matter" and that it is unclear why the SEC needs him to appear for another day of testimony. *Id.* Musk never raised this objection in April 2023, when the SEC staff discussed with his counsel the need for further testimony. He did not raise this objection in May 2023, when he was served with a subpoena requiring his testimony. Nor did he raise it on August 28, 2023, when he requested and received an accommodation as to the date of the testimony and was served with a subpoena with the new date. In any event, as described above, the SEC has obtained a substantial

amount of new information since Musk sat for two half-day sessions of testimony more than one year ago, including new information produced by Musk himself. The SEC is entitled to question Musk regarding that information as part of its investigation.

Second, Musk objected to the SEC's subpoena on the grounds that "[i]n the context of an investigation into the timing and substance of a Schedule 13G, enough is enough." *Id.* This objection fails at its premise. The SEC's investigation pertains to considerably more than the timing and substance of a particular SEC filing; it also relates to all of Musk's purchases of Twitter stock in 2022 and his 2022 statements and SEC filings. *See id.*, ¶ 3 (describing the nature of the SEC's investigation). But even if the SEC's investigation were focused on the timing and substance of a particular SEC filing, the SEC's subpoena would be enforceable. Recipients of lawfully issued subpoenas do not get to pick and choose whether to comply with those subpoenas depending on the potential securities law violations at issue.

Third, Musk objected to San Francisco as a testimony location. *Id.*, ¶ 13, Ex. 4. Musk's subsequent refusal to appear for testimony at any of the SEC's offices, including its Fort Worth, Texas office, which is closest to where Musk resides, has exposed this objection as mere pretext. Moreover, the SEC has statutory authority to compel attendance of witnesses for investigative testimony in any place in the United States. 15 U.S.C. § 78u(b).

Fourth, Musk objected to compliance with the SEC's subpoena on the grounds that the Commission is using its subpoena power to "harass" him. Andrews Decl., ¶ 13, Ex. 4. This is not the first time that Musk has characterized legitimate government investigatory steps as "harassment." The Second Circuit recently rejected Musk's claim of SEC "harassment" in affirming a district court's denial of Musk's motion to terminate a 2018 SEC consent decree, finding it unsupported. *See SEC v. Musk*, Case No. 22-1291, 2023 WL 3451402, at *2 (2d Cir. May 15, 2023) (affirming district court's denial of Musk's motion to terminate SEC consent decree and finding "no evidence to support Musk's contention" that SEC investigations constituted harassment). Musk's vague assertion of SEC harassment here is similarly unsupported. For the reasons described above, the SEC's subpoena to Musk is proper and well

within the SEC's power to conduct investigations into potential violations of the federal securities laws.

Fifth, Musk objected to his testimony on the grounds that a biography of Musk was published on September 12, 2023, "containing new information potentially relevant to this matter." Andrews Decl., ¶ 13, Ex. 4. Musk claims that his "[c]ounsel require time to review this material." *Id.* The publication of Musk's biography is not a legitimate basis for Musk to avoid compliance with a lawfully issued investigative subpoena. In any event, Musk's initial refusal to comply with the subpoena has now presented his counsel with plenty of time to review the biography for any relevant information, and so this objection is now moot in addition to being legally insufficient from inception.

None of Musk's objections has any legal validity, and he has no justifiable excuse for his non-compliance with the SEC's subpoena.

### IV.    **CONCLUSION**

For the foregoing reasons, the Commission respectfully requests that the Court issue an order compelling Elon Musk to comply with the Commission's administrative subpoena requiring his testimony.[2] A proposed order granting such relief is filed concurrently with this application.

Dated:  October 5, 2023                Respectfully submitted,

                                                       */s/ Bernard B. Smyth*
                                                       BERNARD B. SMYTH
                                                       Attorney for Applicant
                                                       SECURITIES AND EXCHANGE COMMISSION

---

[2] The Commission staff is available to conduct Musk's testimony the week of November 13, 2023. The SEC staff can also be available the weeks of November 27, 2023, December 4, 2023, and December 11, 2023.

**<u>EXHIBIT C</u>**

CNBC Article Entitled "Tesla whistleblowers filed a complaint to the SEC in 2021, but the agency never interviewed them.  Here's what the complaint said" by Lora Kolody Dated October 12, 2023



**TECH**

# Tesla whistleblowers filed a complaint to the SEC in 2021, but the agency never interviewed them. Here's what the complaint said

PUBLISHED THU, OCT 12 2023•1:01 PM EDT


**Lora Kolodny**
**@LORAKOLODNY**

SHARE   



**KEY POINTS**

- In 2021, a Tesla employee and a tech industry researcher filed a whistleblower complaint to the SEC with concerns that Elon Musk's car company may have violated securities law and flouted accounting standards.

- The complaint contained detailed allegations about Tesla's financials and business practices, including that it improperly categorized repairs and had poor

control over internal systems used to capture data that later rolled up to financial reports.

- The SEC assigned one person to look at one portion of the complaint, then closed that ticket a few months later, according to records. It never spoke to the whistleblowers nor followed up on their offers to look at more than 18,000 files detailing the allegations, they say.

- The SEC declined to comment on the existence or nonexistence of the complaint, but said the agency evaluates all tips that are submitted.

**In this article**

| TSLA **-4.09 (-1.56%)** ⊞ |

Follow your favorite stocks
**CREATE FREE ACCOUNT**



**A Tesla Model Y on a Tesla car lot in Austin, Texas, May 31, 2023.**
*Brandon Bell | Getty Images*

In the fourth quarter of 2021, a [Tesla](#) ⊞

## TRENDING NOW



**Israel-Hamas updates: Britain orders deployment of military assets to Mediterranean; at least 27 Americans killed**



**Stocks fall as rising rate fears return to Wall Street, Dow tumbles 200 points**



**Comcast, Disney hire investment banks to value Hulu as sale process makes progress**

employee and a tech industry researcher jointly filed a whistleblower complaint to the U.S. Securities and Exchange Commission, expressing concerns that Elon Musk's car company may have violated the law repeatedly, affecting shareholders, employees and customers.

The complaint contained a number of allegations about Tesla's financials and its business practices, including that it improperly categorized repairs for years and that it had poor control over internal systems used for capturing business data that ultimately rolls up to financial and other company disclosures to shareholders.

In January 2022, the SEC assigned one person to look at one part of the complaint related to accounting firm PricewaterhouseCoopers' work for Tesla, then closed that ticket a few months later, according to records reviewed by CNBC.

Agency staff have never spoken with the people who filed the complaint, those people say, and have never taken them up on their offer to review about 18,000 files they say they have for review, including internal Tesla emails, spreadsheets, screenshots, recordings and images, along with public records they gathered to support their allegations.



**Want to test your luck with the $1.73B Powerball drawing? Don't buy your ticket with a credit card**

Sponsored Links by Taboola

**FROM THE WEB**

**Musk's Next Big Project Could be the end of Tesl...**
Investing Outlook

**Billionaire's New Girlfriend Is Raising Eyebrowns**

MW          Click Here

In response to questions from CNBC, the SEC declined to comment on the existence or nonexistence of a possible submission but said the agency evaluates all tips that are submitted. The whistleblowers could earn a financial reward if their complaint leads to the SEC taking some enforcement action and obtaining a monetary settlement or damages.

During the approximately two-year period since the complaint was first filed, Musk sold more than $39 billion of his shares in Tesla, including around $23 billion in 2022, to fund a leveraged buyout of Twitter, the social network he now owns and has rebranded X.

CNBC has reviewed a copy of the complaint — which is known as a TCR, an abbreviation federal agencies use to mean "tips, complaints and referrals" — along with follow-up correspondence to the financial regulator, public records and some of the internal Tesla materials that the whistleblowers wanted the agency to review. The identities of the people who filed the complaint to the SEC are known to CNBC, but they asked to remain unnamed and for their TCR to receive confidential treatment by the agency, citing a fear of retaliation by Musk against employees and critics, especially those who raise issues with government

agencies or press. The whistleblower who was a Tesla employee no longer works there.



**VIDEO** 04:02

## Tesla's limited product line makes pricing power key to growth, says Bernstein's Toni Sacconaghi

CNBC asked accounting, business and securities law experts to read a version of the complaint with the identities of the whistleblowers redacted to protect their privacy.

Ann Lipton, an experienced corporate and securities law trial attorney who now teaches at Tulane Law School and University of Chicago Law School, told CNBC, "Whistleblowers in general can come off like they have an ax to grind. This complaint contains a long list of concerns and some felt more serious than others — but the people who filed it sound plausible," in part because they offered so many specific examples and records from within the

company.

Some of the allegations in the redacted complaint, Lipton said, raise questions about whether Tesla has run afoul of federal securities law, including Section 13 of the Securities Exchange Act, Rule 13a-15 and Rule 15d-15, and the Sarbanes-Oxley Act. Broadly, these rules require companies and their management to maintain sufficient internal systems and processes to track and report financial and business information to auditors and shareholders, and to do so accurately and honestly and at regular intervals.

After reviewing the redacted version of the whistleblower complaint, Karen Nelson, a professor of accounting at Texas Christian University who previously served as an advisor to the Public Company Accounting Oversight Board, said the allegations about "internal control systems," or how Tesla captures its financial and business information for eventual presentation to auditors and shareholders, were concerning.

If the information in the complaint is accurate, Nelson said, "Tesla's information systems don't seem to be very transparent and robust for internal people, which then leads to questions about how the auditor navigated those systems

in their internal control testing, and became comfortable with using the data being produced by it."

CNBC reached out to Tesla multiple times with detailed inquiries about this and other contentions. The company did not respond.

Here's a detailed look at some of the more serious allegations about Tesla in the whistleblower complaint — and at the questions they raise about car quality and financial performance and why these would matter to shareholders or regulators, according to experts in the auto industry, securities and business law, and accounting.

## Warranty repairs

Unlike traditional automakers, Tesla operates with a "direct-to-consumer" model meaning that it sells and services the cars it manufactures, rather than relying on franchised dealerships to do so.



VIDEO 15:27

# Why service is still Tesla's weakness

When Tesla employees complete a repair, they must classify the job within broad pay type categories, including "warranty," "extended service agreement," "customer pay," "rectification," "goodwill" and others, according to internal communications, guides and policies available to employees via a Tesla intranet and reviewed by CNBC.

In their complaint, the tipsters included excerpts from Tesla policies, internal emails, customer service records and other documents to show that they believe employees have been miscategorizing repairs for years and that Tesla management has been aware of the problem.

Under standard warranty accounting practices in the automotive and other industries, companies set aside a portion of each sale to cover future repairs that will be conducted under warranty, Nelson explained to CNBC. These warranty reserves show up as liabilities on a company's balance sheet and show up on the income statement as part of the costs of goods sold. Later, when repairs are recorded as "warranty," the costs of these repairs are

counted against the warranty reserves.

The complaint does not allege that Tesla deviates from this standard industry practice. It instead alleges that Tesla has allowed employees to miscategorize repairs and thereby hide some of its warranty costs.

With a "goodwill" repair, Tesla essentially foots the bill for labor, parts or accessories given to keep a customer happy. According to Tesla's financial statements, the cost of goodwill repairs is not counted against warranty reserves and shows up on the income statement under sales, general and administrative costs.

Meanwhile, "customer pay" repairs are booked as revenue, specifically under the "services and other" category, according to its financial filings. Here, too, the repairs are not counted against warranty reserves.

By charging customers for repair work or by designating repairs as "goodwill" when they should qualify as "warranty" repairs instead, Tesla could be misstating fundamental financial information, the whistleblowers said, urging the SEC to investigate further.

"Were Tesla to accurately categorize its 'goodwill' repairs as warranty repairs, it would

likely need to restate earnings for every quarter since at least 2017," the tipsters wrote in their submission. "It should also be noted that nothing has ever stopped the company from appropriately sizing its warranty reserve even as its service employees handed out too much 'goodwill' repair coverage."



**VIDEO** 01:01:54
PRO **Watch Elon Musk's full interview with CNBC's David Faber on Twitter, Tesla and A.I. advances**

SIGN IN

Indeed, Tesla's goodwill expenses were unusually high for the industry, according to automotive industry veteran Nicholas Parks, who has owned and managed car dealerships in three states, including one in California that sold battery electric vehicles.

In just under two months in late 2021, Tesla was spending over $17 million on "goodwill" in the U.S. alone, which translated to about $70 worth of goodwill on the average repair order

across approximately 247,000 repairs, according to internal Tesla dashboards referenced in the whistleblower complaint and reviewed by CNBC.

This is easily 10 times more money than traditional auto dealers would spend on goodwill per repair on average in two months, Parks told CNBC.

Nelson, the accounting professor, explained why miscategorization of repairs might be of interest to financial regulators and investors.

"Where you put stuff in a financial statement matters," she said. "If I'm taking warranty costs out of the cost of automotive sales, and pushing them down into some other line further down the income statement, that will make my gross profit margin look higher. If I'm moving it from up above in cost of sales, and moving into other expenses, it's also not as transparent about the quality of the product."

Because Nelson did not review all the documentation the whistleblowers had to offer the SEC nor interview them, she would not give an opinion on whether Tesla may have run afoul of accounting requirements or securities laws. However, she did say she was "surprised" that the agency didn't indicate more serious interest

in the whistleblowers.

Inconsistent communications and policy apparently contributed to employees miscategorizing items as "goodwill" or "customer pay" that should have been billed under warranty, the filers' complaint to the SEC said.

Tesla documents read by CNBC show that employees had to navigate a maze of directives available in internal systems, such as WARP (a Tesla-built enterprise resource planning system), intranets and group emails, to figure out how to track and classify billing for each repair.

In one internal "Goodwill Guide," Tesla told employees that any "repair/replacement necessary to correct defects in the materials/workmanship of any parts manufactured/supplied by Tesla" should be covered by and categorized as "Warranty/Extended Warranty pay type (post-delivery)." That would apply to any customer's car that was still under a warranty, while out-of-warranty cars would require a customer to pay for repairs.

For a specific issue — "blistering" headrests in car seats manufactured by Tesla — the company

gave employees different directions about how to bill customers for service to replace the part. One internal Tesla document seen by CNBC said the blistering headrest "is not a defect, and therefore not covered under warranty" and that repairs should be offered as goodwill. Confusingly, that document linked to another page in the company intranet saying customers should have to pay to get their headrests fixed.

Tesla also treated replacement of defective tail lamps as "customer pay," after determining that chemicals used in commercial car washes could cause stress cracks in their lenses, according to internal documents read by CNBC. But in a seemingly contradictory note, an internal e-mail in the second quarter of 2021 referencing the issue said, "First repair and replacement of parts can be covered under Goodwill – Vehicle Quality."

The whistleblower complaint says that Tesla has been aware of inconsistencies in how employees treat repairs. During the second half of 2021, Tesla was working to improve data accuracy from its service division, according to internal records reviewed by CNBC. It set up score cards for each region to include assessments of pay type data, and goodwill and warranty costs. The company was aiming for

better than 90% accuracy in service centers' pay type data at that time, the internal records said.

Parks, the former automotive dealer, said with traditional dealerships, 99% or higher accuracy would be expected, and dealerships typically employ a number of specialists to ensure accuracy. "If dealership employees do not enter information about a repair correctly, then a claim may not get paid or you may end up having a warranty audit where the automaker comes in and charges back these claims and that's painful," he explained.

## Questioning disclosures and data

In their 2021 complaint, the whistleblowers alleged that Tesla's internal software and systems are constantly changing and have been rife with bugs and vulnerabilities throughout the years, and that third-party accountants or auditors may not have been given full access to, or thoroughly vetted, all of them.

The complaint said the whistleblower who had been a Tesla employee was authorized to access a wide array of records — including policies, internal emails, and sales- and service-related data — at Tesla through software and systems used daily by thousands of employees for

normal work, including both custom-built and off-the-shelf programs.

CNBC spoke with one current and two former Tesla employees who corroborated that most people working for Tesla have broad access to apps and information inside the company by default. They also noted the array of apps within Tesla has grown through the years, as would be expected with a growing business in a complex industry. These people requested anonymity as they were not authorized to speak on Tesla's behalf.

The complaint embedded images of what the whistleblowers said were emails, spreadsheets and screenshots of some of Tesla's homegrown software and back-end systems. It said these showed that non-administrative and non-executive employees had access to read and edit data points, via a developer tool called MySQL Workbench, that could later feed into Tesla's shareholder communications and financial statements.

In one example, the tipsters said screenshots showed other Tesla employees changed the status of material used in manufacturing from "scrap" to "work in progress." Scrap refers to material generated from a manufacturing job that is unusable waste.

In another example, the complaint said screenshots showed Tesla employees had manually changed the status of "used" cars to "new" in a program that tracked vehicle deliveries data. This could affect Tesla's delivery numbers, they said, though they didn't try to estimate the overall impact and instead encouraged the SEC to investigate further.



**VIDEO** 05:19

**Tesla's value is dismissing fundamental challenges, says Barclay's Dan Levy**

In early 2022, the whistleblowers wrote to the SEC expanding on their initial complaint. They described multiple databases and a separate, paper-based process for auditors that had been used over time at Tesla for tracking vehicle sales and deliveries. The ever-changing systems led to inconsistent measurements and definitions of "deliveries," they alleged.

CNBC reached out to Tesla for comment on

these specific allegations in the complaint and received no response.

Deliveries are the closest approximation of sales reported by Tesla in quarterly disclosures, and one of the numbers Wall Street watches most closely. If they were recorded inaccurately, the company could have met or beat analysts' expectations for deliveries on the basis of flawed or falsified data.

In the fourth quarter of 2021, just before the whistleblowers sent their followup email, Tesla reported that it had reached 308,000 vehicle deliveries — a number that handily beat analysts' expectations.

Issues related to accurate tracking of deliveries would potentially merit an investigation into the reliability and accuracy of Tesla's disclosures and financial reporting, and analysis of whether Tesla meets the standards and has safeguards in place that would be required under the Sarbanes-Oxley Act, the whistleblower complaint said.

Under Sarbanes-Oxley, a company's management is required to disclose the efficacy of its internal controls and identify weaknesses, such as the ability of unauthorized users to access sensitive data. Sarbanes-Oxley also

requires auditors to check and report on these controls, so that investors can confidently rely on the financial statements and so that companies can avoid having to restate financials later on.

Business and securities law expert Lipton told CNBC if there are weaknesses in either "disclosure controls" or the "internal controls over financial reporting" at Tesla, there could have been a "potential violation of the substantive requirement that such controls be maintained" under Section 13 of the Exchange Act, and there might have been "false statements by the company, Musk, the CFO, or PwC regarding the effectiveness of internal controls."

"To the extent we're talking about false statements, the kind of bottom-line trouble that might be involved depends on the level of fault," Lipton said. "If the controls turn out to be faulty, but there was no flaw in the assessment — that is, top management and PwC reviewed everything, but the problems were too far down the chain to detect easily — then they may not be facing penalties for false statements. Obviously, matters become more serious if they intentionally or recklessly or perhaps even negligently misstated the state of

10/12/23, 12:08 PM

the internal controls."

## Going concern

In 2022, Tesla boasted net income of $12.56 billion and cash reserves of $22.10 billion, but Musk sometimes reminisces about earlier days when the company nearly went bankrupt. The whistleblower complaint alleged that, given Tesla's financial status in 2018, when it was ramping up production of its lowest-cost Model 3 sedan, it should have been more transparent with shareholders at the time. The complaint said Tesla should possibly have issued a "substantial doubt" statement, also known as a going concern warning, in its 2018 SEC filings, which it did not.

In 2019, Musk discussed Tesla's near-bankruptcy under oath in the Delaware Court of Chancery, which the whistleblowers referenced in later correspondence to the agency. Their initial complaint also referenced internal materials pertaining to the company's bank account balances, but the SEC did not follow up to ask for the documentation.





**VIDEO** 01:05

**SEC suing Elon Musk to force him to testify in Twitter probe**

Accounting expert Nelson told CNBC, in general: "Management should provide an explicit substantial doubt statement in the financial statements if it is probable that the company will not be able to meet its obligations within one year from the date the financial statements are issued. However, if they have plans that will alleviate that doubt, then they should disclose those plans but do not need to make a substantial doubt statement," following accounting standards of the Financial Accounting Standards Board that have been in effect since mid-December 2016.

## Auditors' work for other Musk companies

Tesla's auditing firm since 2005, PricewaterhouseCoopers, has also done tax-related consulting work for Musk enterprises SpaceX and The Boring Company, according to internal Tesla materials the whistleblowers offered to the SEC. In correspondence to the agency expanding on their complaint, the

whistleblowers alleged this raises questions about the firm's independence and objectivity in judging Tesla's financials.

Besides offering internal materials from Tesla, the whistleblowers pointed to obscure public records from the California Alternative Energy and Advanced Transportation Financing Authority that they say also showed PricewaterhouseCoopers did non-audit work for Musk companies while serving as Tesla auditor.

Although there are only four major auditing firms, there are dozens of reputable firms Musk's privately held enterprises could have turned to for tax consulting.

Securities law expert Lipton said that generally, auditors are not supposed to do certain kinds of consulting services for their audit clients or for affiliates of their clients if "a reasonable person would question your independence."

According to records reviewed by CNBC, the SEC assigned an employee to look into possible conflicts of interest in January 2022 but closed that ticket in April without interviewing the whistleblowers or evaluating their documentation.

Case: 22-16110, 10/12/2023, ID: 12808661, DktEntry: 48, Page 85 of 88

PricewaterhouseCoopers declined to comment. Tesla did not respond to multiple inquiries for comment.

## How the SEC handles whistleblower tips

The people behind the whistleblower complaint have followed up repeatedly with the SEC since late 2021, contacting different attorneys and other appropriate authorities within the agency to ensure they were aware of the tip.

After filing their TCR submission, the whistleblowers said, they emailed and left voicemails for multiple SEC employees, following up on the tip and emphasizing the substantial quantity of records they were making available to the SEC for review. The SEC employees they reached out to included successive San Francisco bureau chiefs for the agency, as well as other SEC attorneys and whistleblower program staff in 2023.

In October 2022, about a year after the whistleblowers submitted their complaint, the Office of the Inspector General publicly voiced concern that the financial regulator, under Chair Gary Gensler, was not properly staffed and that turnover at the senior officer level was abnormally high, over 20%. High attrition in

Case: 22-16110, 10/12/2023, ID: 12808661, DktEntry: 48, Page 86 of 88

the agency and other factors, the Inspector General's office wrote, could result in "improper handling of TCRs" and may "impede SEC investor protection efforts."

According to Alex Platt, a professor at the University of Kansas School of Law, whose SEC whistleblower research was published in the Yale Journal of Regulation, around 30 to 50 SEC staffers have been assigned to the office that screens tips, complaints and referrals. Platt said he believes this office is under-resourced.

Since the agency began offering a bounty for whistleblower tips in 2011, it had received about 52,400 tips and issued 216 awards as of September 2021. From the start of the program through the end of 2020, Platt's research found, the average SEC whistleblower award amounted to around $6.2 million, with the median around $1.5 million.

"Generally, you take how much the SEC gets from its enforcement action, and the whistleblowers get between 10% and 30%, based on multiple factors, including how helpful they were," Platt explained.

Whether a tip gets selected for investigation, enforcement, and awards depends on whether it matches the SEC's current enforcement

priorities, the professor said. Attorneys who are former agency officials have the greatest success in obtaining awards for their clients, using their unique access and insight into the agency's priorities to pick the "right" clients and shape their submissions, Platt told CNBC.

An SEC spokesperson disputed Platt's characterization that the agency pays more careful attention to submissions from whistleblowers who have attorneys with prior SEC experience.

The spokesperson said in an email to CNBC: "The priority of the whistleblower program is to incentivize individuals to come forward and report possible violations of the federal securities laws to the SEC. The whistleblower office encourages all individuals with information about fraud or wrongdoing involving potential violations of the federal securities laws to submit their whistleblower tips and any additional information electronically through the Commission's online TCR portal."

## Closing Bell

UP NEXT | **Closing Bell** 04:00 pm ET



WATCH LIVE ⊙



     

Subscribe to CNBC PRO

Select Personal Finance

Supply Chain Values

Digital Products

Corrections

Site Map

Help

Licensing & Reprints

CNBC on Peacock

Select Shopping

News Releases

About CNBC

Podcasts

Contact

CNBC Councils

Join the CNBC Panel

Closed Captioning

Internships

Ad Choices

Careers

## News Tips

Got a confidential news tip? We want to hear from you.

GET IN TOUCH

## CNBC Newsletters

Sign up for free newsletters and get more CNBC delivered to your inbox

SIGN UP NOW

Get this delivered to your inbox, and more info about our products and services.

## Advertise With Us

PLEASE CONTACT US

Privacy Policy | Do Not Sell My Personal Information | CA Notice | Terms of Service

© 2023 CNBC LLC. All Rights Reserved. A Division of NBCUniversal

Data is a real-time snapshot *Data is delayed at least 15 minutes. Global Business and Financial News, Stock Quotes, and Market Data and Analysis.

Market Data Terms of Use and Disclaimers

Data also provided by REFINITIV